**LEHMAN BROTHERS HOLDINGS, INC., Plaintiff,**

v.

**GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, L.P., Defendant.**

Civil Action No. 11–6089.

United States District Court, E.D. Pennsylvania.

Dec. 17, 2013.

Matthew D. Spohn, Fulbright & Jaworski, L.L.P., Denver, CO, Thomas P. Donnelly, Antheil Maslow & MacMinn LLP, Doylestown, PA, for Plaintiff.

Michael H. Kaliner, Adelstein & Kaliner LLC, Doylestown, PA, Paul Bucco, Robert Ardizzi, Davis, Bucco & Ardizzi, Conshohocken, PA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ANITA B. BRODY, District Judge.

Lehman Brothers Holdings, Inc. ("Lehman"), the plaintiff, has brought suit against Gateway Funding Diversified Mortgage Services, L.P. ("Gateway"), the defendant, for contractual obligations between Lehman and Arlington Capital Mortgage Corporation ("Arlington"). Lehman's claim is based on a theory of successor liability, an alleged *de facto* merger between Arlington and Gateway.

Lehman purchased four loans from Arlington[1] under a Loan Purchase Agreement in which Arlington warranted to Lehman that the loans did not contain misrepresentations. In 2007, Arlington acknowledged misrepresentations in three of the four loans—the two Pimentel Loans and Steinhouse Loan—and agreed to indemnify Lehman for all losses and damages suffered on the three loans. Arlington never indemnified Lehman. Lehman also claims that the fourth loan, the McNair Loan, also contained misrepresen-

---

1. Lehman Brothers Bank FSB ("LBB"), a subsidiary of Lehman, purchased the four loans from Arlington and subsequently sold these loans to Lehman, the plaintiff in this case.

tations. Arlington, however, never acknowledged misrepresentations in the McNair Loan. Lehman argues that Gateway is now liable for these four loans because Arlington and Gateway entered into a *de facto* merger in early 2008.

On January 31, 2013, Lehman moved for summary judgment,[2] arguing that Gateway is Arlington's successor under the *de facto* merger doctrine, that Arlington's contractual breaches and the damages from those breaches are not in dispute, and that Gateway is therefore liable to Lehman. I granted this motion in part, finding that Arlington's contractual breaches with respect to the indemnification agreements associated with the Pimentel and Steinhouse loans were not in dispute. I also found that no dispute existed as to the damages associated with those breaches and that the total damages for the three loans was $448,533.08 plus 6% prejudgment interest. I found that questions of fact remained as to whether: (1) Gateway is liable under the *de facto* merger doctrine for the damages associated with the four loans and (2) Arlington breached its Loan Purchase Agreement with respect to the McNair Loan. From August 21–22, 2013, I held a bench trial on these two questions. Both sides submitted proposed findings of fact and conclusions of law.[3] Below are my findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Entities Involved

1. Arlington was primarily in the residential mortgage origination business. Arlington funded loans itself and also acted as a mortgage broker, receiving borrower applications and giving them to other companies to fund. Day 1 Tr. 132:8–20; Day 2 Tr. 17:11–21. As to the loans that Arlington funded, Arlington acted as a correspondent lender that sold the loans on the secondary market to investors such as Lehman. Day 1 Tr. 17:12–14; Day 2 Tr. 17:22–18:3.

2. Arlington often entered into loan purchase agreements with these secondary market investors. These agreements commonly incorporated a "seller's guide" that included representations and warranties that Arlington made with respect to the loans it sold. Day 2 Tr. 20:19–25. One of the typical representations and warranties Arlington made to purchasers was that the information in the loan file was materially correct. Day 2 Tr. 21:1–5.

3. Lehman Brothers Bank FSB ("LBB") is a subsidiary of Lehman that bought the four loans in dispute in this case—the Pimentel, Steinhouse, and McNair Loans—from Arlington and subsequently sold these loans to Lehman. Day 1 Tr. 11:8–12, 17:12–13.

4. Lehman is a secondary market investor that purchased the Pimentel, Steinhouse, and McNair loans from LBB. *Id.*

5. Gateway is a residential mortgage lender that originates mortgage loans and then sells them to secondary market investors. Day 1 Tr. 73:20–74:12. Like Arlington, Gateway functions as a correspondent lender. Day 1 Tr. 74:4–9.

---

**2.** Gateway also moved for summary judgment on the grounds that the *de facto* merger doctrine had been abolished by law, and that Lehman's suit violated the statute of limitations, res judicata, and the statute of frauds. I denied that motion in its entirety.

**3.** Diversity jurisdiction lies over Lehman's state law claims under 28 U.S.C. § 1332.

6. Gateway is a limited partnership under Pennsylvania law. Michael Karp owns the entire partnership interest in Gateway, but does not participate in the operations of the company. Day 1 Tr. 72:20–73:15. Karp owns ninety-nine percent of the membership of the limited partnership and Gateway, Inc.-a holding company owned entirely by Karp-owns the remaining one percent. Day 1 Tr. 72:20–73:2. Bruno Pasceri ("Pasceri") is the president and CEO of Gateway and has operational decision making authority for Gateway. Day 1 Tr. 72:16–17, 73:17–19.

**B. The Relationship Between Arlington and Gateway**

**1. The Asset Purchase Agreement and Transaction Between Arlington and Gateway**

7. Arlington has four shareholders: Philip Russo ("Russo"), Kevin Kenyon ("Kenyon"), Daniel Leinhauser ("Leinhauser"), and Joseph Granahan ("Granahan"). Russo is the majority shareholder of Arlington. Day 2 Tr. 13:18–24. Russo served as Arlington's CEO, Kenyon served as president, and Granahan and Leinhauser both served as executive vice presidents. Day 2 Tr. 14:13–21. Michael Lord ("Lord") served as Arlington's CFO, but was not a shareholder of Arlington. Day 2 Tr. 14:22–15:1.

8. A warehouse line is a commercial line of credit that Arlington used for the purpose of funding the mortgage loans it originated. Day 2 Tr. 22:3–12. After Arlington sold a mortgage on the secondary market, it would pay back the warehouse credit. See id.

9. By 2007, Arlington was concerned that it might lose all of its warehouse lending relationships. Day 2 Tr. 21:16–22; Day 1 Tr. 109:4–16. Arlington had already lost one of its warehouse lines in mid–2007. Day 2 Tr. 21:16–19. At the time, warehouse lenders were restricting the amount of money they would lend. Day 1 Tr. 109:9–12.

10. Arlington could not function in the mortgage business without access to these lines of credit. Day 2 Tr. 22:14–16, 26:4–5. Even if Arlington did not lose all of its warehouse lines, Arlington still needed to ensure that it had sufficient capacity on its lines to meet the volume of loans it produced. Day 2 Tr. 26:11–21. The loss of Arlington's warehouse lines threatened the viability of the company going forward. Day 1 Tr. 109:7–16.

11. In late 2007, Russo and Kenyon met with Pasceri, the CEO of Gateway, to discuss a potential deal between Arlington and Gateway. Day 2 Tr. 26:22–25; Day 1 Tr. 77:2–4.

12. Pasceri testified that Arlington's owners initiated discussions with Gateway about selling their residential mortgage loan business because they wanted to stay in business and keep their sales force intact, despite Arlington's financial problems. Day 1 Tr. 77:5–14. Russo understood that a deal with Gateway would give him the opportunity to "practice [his] craft in a larger, deeper-pocketed, better capitalized organization." Day 2 Tr. 27:5–10. Granahan believed that the intent of the transaction was to join with an organization with larger capacity than Arlington. Day 1 Tr. 134:23–135:1.

13. Pasceri wanted to obtain Arlington's business because Arlington was better equipped than Gateway at originating certain loan products, such as

jumbo loans,[4] and because Arlington's business would complement Gateway's business and increase Gateway's production. Day 1 Tr. 83:15–84:10.

14. On February 8, 2008, Arlington and Gateway entered into what was named an Asset Purchase Agreement ("APA"). Pl.'s Ex. 6. Under the APA, Arlington sold to Gateway "all of [Arlington]'s right, title and interest in and to the personal, tangible, intangible and other properties, rights and assets used in the operation of or held for use or useable in the Business...." Pl.'s Ex. 6 at § 2.01. The APA defined the "Business" to mean "retail mortgage origination services." *Id.* at Recitals, Schedule 1.01. The APA also stated that the "Assets Used in the Business" "represent all of the assets used by [Arlington] to conduct its mortgage origination business as it is now being conducted." *Id.* at § 4.03.

15. Gateway obtained "all of the following assets of [Arlington]" including: equipment, fixtures, and furniture; intellectual property; computer software; telephone numbers, domain names, and email address; credits, advance payments and deposits; all loans on both warehouse facilities; "[a]ll accounts receivable as of the Closing Date;" "[r]ights to all prepaid expenses as of the Closing Date;" "[r]ights in and to any restrictive covenants and other obligations of present and former employees, independent contractors, consultants, suppliers and customers to [Arlington];" "[a]ll cash in all accounts, including excess cash in both Warehouse Facilities;" and "[c]laims and rights

against third parties" related to the purchased assets. *Id.* at § 2.01.

16. Gateway also obtained "[a]ll Pipeline Loans that have not gone to settlement by the Closing Date." *Id.* The APA defined "Pipeline Loans" as "any residential mortgage loan for which an application has been taken by [Arlington]'s employees on or before the Closing Date, and that has not been closed and for which a check has not been issued or wire has not been sent as of the Closing Date." *Id.* at Schedule 1.01.

17. The primary asset that Pasceri wanted was Arlington's loan pipeline. Day 1 Tr. 87:21–23.

18. Although the pipeline *itself* had a discernible lifetime and contains a discrete number of loans, Pasceri also admitted that he wanted the "ongoing business" of Arlington, that he wanted to continue the mortgage operations, even after the pipeline closed, and that he was not only buying the residential mortgage loans in process, but "the ability to get that ... business in the future." Day 1 Tr. 84:20–24, 88:6–11, 99:4–6.

19. The APA provided for a $500,000 purchase price for Arlington's assets. Pl.'s Ex. 6 at § 2.04. Pasceri based this price on the value of Arlington's loan pipeline. Day 1 Tr. 167:17–19, 168:4–7.

20. The APA, however, included "all cash in all accounts" as one of the assets Arlington transferred to Gateway. Pl.'s Ex. 6 at § 2.01(*o*). Although the actual amount of cash transferred to Gateway at closing is unclear, Russo estimated only that this amount was less than $500,000 and that much of the $1.5 million in

---

4. A jumbo loan is one with a principal balance that exceeds the conventional guidelines set by Fannie Mae and Freddie Mac. Day 1 Tr. 78:7–79:11.

cash identified in Arlington's November 2007 balance sheet was encumbered. Day 2 Tr. 41:14–43:22; Pl.'s Ex. 6. "The net effect was that [Arlington] had more cash that was unencumbered and actually spendable after [Arlington] accomplished the sale than what [it] started with." Day 2 Tr. 43:14–16. Thus, although Arlington had more liquid cash after the sale, Arlington's net compensation from Gateway amounted to less than the $500,000 purchase price specified in the APA because the cash in Arlington's accounts went to Gateway at closing.[5]

21. In addition to purchasing substantially all of Arlington's assets, Gateway also assumed many of its liabilities. Under the APA, Gateway assumed certain liabilities of Arlington, including all of Arlington's warehouse debt, all accounts payable, all accrued payroll, lock fees, escrows, almost all accrued expenses, and a loan and a line of credit from Wilmington Trust. *Id.* at § 2.03(a).

22. Pasceri testified that Gateway took over all of Arlington's debt and liabilities related to the pipeline. Day 1 Tr. 202:25–203:3.

23. Arlington and Gateway also signed an "Assignment, Delegation and Assumption Agreement." Pl.'s Ex. 30. This agreement states that Gateway "is to assume, substantially all of the contracts, liabilities and obligations of [Arlington] relating to [Arlington]'s business and operations except for Excluded Liabilities (as defined in the Purchase Agreement)." *Id.*

24. Under the APA, excluded liabilities include liabilities related to litigation pending between Arlington and Bancorp and "claims for indemnification, repurchase or make-whole by Morgan Stanley, Credit Suisse, EMC or any other secondary market investor." *Id.* at § 2.03(b).

25. Gateway did not receive Arlington stock as a part of the asset purchase transaction and the four Arlington shareholders did not receive Gateway stock. Day 2 Tr. 115:1–9. The Arlington shareholders continue to own their stock. Day 2 Tr. 164:5, 119:15–17; Day 1 Tr. 152:10–12, 127:25–128:1.

## 2. Agreements Between the Four Arlington Shareholders and Gateway

### a. The Arlington Shareholders' Employment Agreements

26. As a condition of closing the asset purchase transaction, each of the four

---

**5.** Pasceri's testimony conflicts with Russo's testimony on this point. Pasceri admitted that Gateway was contractually entitled to the cash in Arlington's accounts, but asserted that Gateway did not receive this cash. Pasceri claimed that Arlington liquidated its accounts between November 30, 2007 and the closing of the asset purchase transaction, even though Arlington was contractually required to operate in the ordinary course of business. Pasceri agreed that liquidating all cash was *not* in Arlington's ordinary course of business. Day 1 Tr. 93:11–95:16. Russo, however, stated that Arlington's cash did transfer to Gateway at closing. Day 2 Tr. 43:17–22. The court finds Russo more credible on this issue because Russo was the CEO of Arlington and likely had more awareness of the fate of Arlington's cash. Furthermore, Pasceri's explanation of what happened to the cash contradicts the requirements of the APA, which prohibited Arlington from disposing of its cash. *See* Pl.'s Ex. 6 at § 4.08 (Arlington represented and warranted that "[s]ince November 30, 2007 there has not been any transaction or occurrence in which [Arlington] has: . . . sold, transferred or otherwise disposed of any of its material assets except in the ordinary course of business.").

Arlington shareholders signed an employment agreement with Gateway. Pl.'s Ex. 6 at § 3.02(f), (j); *see also* Pl.'s Ex. 9, 12, 15, 18. Only the four Arlington shareholders signed these agreements as part of the closing. Kenyon, Leinhauser, and Granahan signed "Branch Manager Employment Agreements," while Russo signed a different "Employment Agreement," providing for special compensation terms and benefits.

### i. Arlington's Majority Shareholder: Russo

27. Russo's Employment Agreement specified that Russo would serve as President of Gateway and would receive a salary of $216,000 per year. Pl.'s Ex. 9 at § 4(a). Russo also received commissions on loans he originated in order to compensate him for his personal production. Day 1 Tr. 174:4–8.

28. In addition to his salary and commission, Russo's Employment Agreement provided that he would receive "Branch Profit Sharing" payments. Pl.'s Ex. at § 4(b). As a part of this profit sharing, Russo received:

> ten percent ... of the branch profit of the Arlington Branch .... the "Arlington Branch" shall mean the offices acquired by [Gateway] from Arlington in connection with the purchase of Arlington's business and any offices to which any of such business operations are transferred

and any new offices opened with respect to such business operations.... These profit sharing payments shall be due and payable to the Employee for the first 3 years of the Employment Period regardless of whether or not the Employee remains employed by [Gateway].

*Id.* After the first three years, the agreement provided that Russo would receive fifty percent of Gateway's Arlington Branch profits, if he is still employed by Gateway. *Id.*

29. Russo admitted that he shared in the profits of Arlington when he was an owner of Arlington, and negotiated an agreement with Gateway where he continued to share in the net profits of Arlington's operations for three years. Day 2 Tr. 54:22–55:3.[6]

30. Russo also received "Company Profit Sharing" payments as a part of his Employment Agreement. Pl.'s Ex. 9 at § 4(c). The agreement required Gateway to "pay to the Employee an amount equal to five percent ... of the profits of [Gateway] during each fiscal year of [Gateway]...." *Id.*[7] Russo received these Gateway profit sharing payments regardless of whether the profits originated from the Arlington Branch of Gateway. Day 2 Tr. 55:4–9. These payments were equivalent to those received by Pasceri, Gateway's CEO. Day 1 Tr. 177:4–8. In 2008, only two employees other than Russo–Pasceri

---

6. Pasceri claims that Russo never received the Arlington Branch profit sharing payments, even though the agreement entitling Russo to these payments is still in force. Day 1 Tr. 176:1–12. Russo, however, did not deny that he had received the payments and admitted to negotiating the provision. Day 2 Tr. 54:25–55:3. The court finds Pasceri's testimony incredible on this issue. However, re-

gardless of whether Russo received some, all, or none of these payments, he was still contractually entitled to share in the profits of the Arlington Branch of Gateway.

7. In one of the years in which Russo received these payments, he only received three percent of Gateway's profits. Day 2 Tr. 55:15–19.

and Gateway's CFO—were entitled to share in Gateway's profits. Day 1 Tr. 177:9–18.

31. The Employment Agreement also provided that Russo would receive special severance payments if Gateway terminated Russo without cause. Pl.'s Ex. 9 at § 9. In addition to the normal Gateway severance package, Russo would receive an additional "Arlington Severance." *Id.* The Arlington Severance consisted of "an additional lump sum severance benefit in an amount equal to twelve (12) months of the profit sharing payments as provided in Section 4(b) hereof based on the Arlington branch's average monthly profit for the immediately preceding twenty-four (24) calendar months ("Arlington Severance")." *Id.* Russo was the only Gateway employee entitled to an "Arlington Severance." Day 1 Tr. 181:11–15. Additionally, Russo would receive a third severance benefit in "an amount equal to three (3) months of the profit sharing payments as provided in Section 4(c) based on [Gateway's] average monthly profit for the immediately preceding twenty-four (24) calendar months . . . ." Pl.'s Ex. 9 at § 9.

32. Russo's Employment Agreement provided for "Change of Control" payments. Pl.'s Ex. 9 at § 10. If Gateway sold all or substantially all of its assets or transferred partnership interests representing a majority of the economic interest in Gateway, Russo would get the lesser of $500,000 or five percent of the excess of the consideration paid over the tangible book value of Gateway. If the change of control occurred within three years, Russo would receive at least "half the profit on the Arlington Branch Profit and Loss Statement, for the balance of months through February, 2011." *Id.*

33. Russo admitted that he was betting on the Arlington Branch's continued existence and hoping that its pipeline of loans would continue to replenish, because Russo had compensation tied to the Arlington Branch's success. Day 2 Tr. 70:20–71:9.

34. Russo thus continued to share in the profits of the Arlington Branch of Gateway—regardless of whether he remained employed by Gateway—and was eligible for severance benefits and Change of Control payments tied to the profits of the Arlington Branch. Russo also received five percent of the profits of Gateway as a whole.

35. As President of Gateway, Russo participated in Gateway's Senior Management Team Meetings.[8] Russo participated in these meetings for two years.[9] Day 2 Tr. 51:3–11, 53:4–11.

36. Russo is no longer the president of Gateway. Day 2 Tr. 51:3–6. He currently serves as a Gateway branch manager. Day 2 Tr. 144:10–12. 32.

### ii. The Other Three Arlington Shareholders

37. Kenyon, Granahan, and Leinhauser entered into "Branch Manager Employment Agreements" with Gateway. Pl.'s Ex. 12, 15, 18. Although they did not participate in Senior Team Meetings, Gateway hired the three Arling-

---

8. Gateway is managed by a Senior Management Team. Day 2 Tr. 169:8–19.

9. Pasceri's testimony contradicts Russo's testimony. Pasceri testified that Russo attended only a few meetings. Day 2 Tr. 170:8–10. The court finds Russo's testimony more credible on this issue.

ton shareholders as branch managers of the former Arlington offices that became the Arlington Branch of Gateway. Day 1 Tr. 112:2–11, 139:8–10.[10] These branches used the Arlington Capital Mortgage name as a d/b/a and used the Arlington name outside their front door. Day 1 Tr. 112:5–11. In this capacity, the three Arlington shareholders supervised many of the same employees they had previously supervised at Arlington and did so at the former Arlington locations. Day 1 Tr. 113:4–14. As branch managers, Kenyon, Granahan, and Leinhauser had the ability to hire and fire "to a certain degree." Day 1 Tr. 182:22–23.

38. These former Arlington offices essentially functioned as "net branches" of Gateway. Day 1 Tr. 138:25–139:10, 110:1–16, 112:2–11.

39. "Net branch" is a term of art in the mortgage industry that refers to a branch where every dollar of income and expense attributable to the branch goes to its profit and loss, and then the operators of the net branch share in the profits of their branch, similar to a small business owner. Day 1 Tr. 110:5–25, 145:22–25. If the company provides a service to the net branch, the value of that service typically counts against the net branch's profit as an expense. Day 1 Tr. 111:7–13.

40. The Branch Manager Employment Agreements defined the compensation for the three branch managers as the "the net profit from the loan production associated with your branch." Pl.'s Ex. 12, 15, 18 at Ex. B.

41. The three Arlington shareholders thus received the profits derived from the former Arlington offices that they managed at Gateway. At Arlington, the four owners had also received compensation based on the profits of Arlington. Day 1 Tr. 145:11–14.

42. Granahan agreed that, financially, Gateway treated him as an owner of the particular branch he managed because he received a cut of the profits. Day 1 Tr. 145:15–25. Granahan received this compensation in addition to a salary. Day 1 Tr. 138:23–24.

43. At Gateway, Leinhauser also served as an operator of a net branch that formerly existed as an Arlington office. Day 112:2–11. Leinhauser agreed that an owner of a net branch shares in the profits of that branch much like a business owner does. Day 1 Tr. 110:21–25.

44. Kenyon, Granahan, and Leinhauser did not have a different compensation package than other branch managers under the Gateway umbrella. Day 1 Tr. 202:5–11.

45. Although Kenyon, Granahan, and Leinhauser had limited authority to bind Gateway on their own, their Branch Manager Employment Agreements provided that they could bind Gateway if they had "first been authorized in writing by one of the following officers of [Gateway] (or their successors bearing such title(s) [sic]: Bruno Pasceri, Chief Executive Officer[;] Philip Russo, President." Pl.'s Ex. 12, 15, 18. The Branch Manager Employment Agreements also provided that the branch managers did

---

10. Although Kenyon never explicitly testified that the net branch he supervised was a former Arlington office, his email (kkenyon@arlingtoncapital.com) was listed as the contact for the "Princeton–Arlington" office of Gateway on Gateway's website in 2010 and 2011. *See* Pl.'s Ex. 33, 34. The "Princeton–Arlington" office was formerly an Arlington office. *See* Pl.'s Ex. 31 at Ex. A.

"have authority to bind [Gateway] in matters involving the origination and servicing of mortgages insured under the FHA mortgage insurance program pursuant to FHA rules." *Id.*

### b. The Arlington Shareholders' Agreements Not to Compete With Gateway

46. As a condition of closing the asset purchase transaction, each of the four Arlington shareholders also signed Agreements Not to Compete with Gateway. *See* Pl.'s Ex. 10, 13, 16, 19. Only the four Arlington shareholders needed to sign these agreements as part of the closing. Day 1 Tr. 189:16–190:19; Pl.'s Ex. 6 at §§ 3.02, 3.03.

47. The Agreements Not to Compete defined each of the four owners as "Stockholder," and recited that "[i]n light of Stockholder's ownership of shares of capital stock of [Arlington], his position as an officer of [Arlington], and his employment by [Gateway] after the purchase of the assets of [Arlington], one of the conditions to the consummation by [Gateway] of the transactions contemplated in the Purchase Agreement is that Stockholder enter into this Agreement Not to Compete for the purpose of preserving for [Gateway]'s benefit the proprietary rights and going business value of [Arlington]." *See* Pl.'s Ex. 10, 13, 16, 19. The agreements further stated that, pursuant to the APA, Gateway "is purchasing from [Arlington] substantially all of the assets of [Arlington] ... including business relationships and certain other intangible assets." Pl.'s Ex. 10, 13, 16, 19.

48. Each agreement contained a provision identifying the consideration the stockholders received for their Agreement Not to Compete with Gateway and provided for the following payments:

(a) Russo: a $143,200 cash lump sum payment and a forgivable loan in the amount of $100,000. Pl.'s Ex. 10.

(b) Kenyon: a $100,000 cash lump sum payment and a forgivable loan in the amount of $60,000. Pl.'s Ex. 19.

(c) Leinhauser: a $65,000 cash lump sum payment and a forgivable loan in the amount of $60,000. Pl.'s Ex. 13.

(d) Granahan: a $140,000 cash lump sum payment and a forgivable loan in the amount of $100,000. Pl.'s Ex. 16.

49. These payments are not proportional to the shareholders' respective ownership interests in Arlington: Russo owned 51.0204% of Arlington's stock, Kenyon owned 30.6122%, and Leinhauser and Granahan each owned 9.1837%. *See* Def.'s Ex. 11.

50. Pasceri testified that the agreements had no connection to the shareholder's ownership of Arlington's stock and did not compensate them for the value of that stock. Day 1 Tr. 190:20–191:1. Instead, Pasceri testified that the agreement was for his own protection so that the Arlington shareholders would not compete with Gateway after the transaction. Day 1 Tr. 194:2–10. Although Pasceri referred to the forgivable loans as part of the "buyout" in his deposition, he denied any connection between the loans and the shareholder's ownership interest at trial. Day 1 198:22–199:21.

51. Russo, Kenyon, and Leinhauser do not believe that their agreements not to compete reflect their shares in Arlington. Day 2 Tr. 164:6–9; Day 1 Tr. 127:23–24; *see* Day 2 Tr. 119:11–17.

52. Granahan, however, testified that his compensation under his Agreement Not to Compete compensated him in part for his employment and in

part for his ownership interest in Arlington, which was rendered worthless by the transaction. Day 1 Tr. 157:7–16. Granahan expected compensation from Gateway for the depletion of the value of his ownership interest in Arlington, because if Arlington retained no assets, he assumed his ownership would be worthless. Day 1 Tr. 143:15–144:9. Unlike Pasceri, Kenyon, and Russo, Granahan no longer works for Gateway. In light of his status as a disinterested third party and the fact that the transaction greatly depleted the value of Arlington's stock, I find his testimony to be credible.

53. Leinhauser also agreed that his stock in Arlington is worthless. Day 1 Tr. 128:6–8.

54. Since 2008, Arlington has made no stock distributions. Day 2 Tr. 82:11–17.

### 3. Arlington's Employees After the Gateway Transaction

55. The APA states that "[i]t is the intention of [Gateway] that [Gateway] shall employ all of [Arlington]'s existing qualified loan production and production support employees that are employed in connection with the operation of the Business," as well as additional employees listed in a separate schedule. Pl.'s Ex. 6 at § 6.08. The additional list of employees contains approximately 180 people, including branch managers, accountants, underwriters, compliance coordinators, financial analysts, IT staff, administrative assistants, and a Human Resources generalist, among others. Pl.'s Ex. 7. The APA stated that Gateway would "credit" these "Transferred Employees" for their "years of service with [Arlington]." Pl.'s Ex. 6 at § 6.08.

56. Gateway also hired Lord, Arlington's CFO, as a controller. Pl.'s Ex. 7; Day 1 Tr. 105:11–16. Eventually, Lord also became Gateway's CFO. Day 2 Tr. 52:4–5.

57. Gateway offered employment to the "large majority" of Arlington employees, and approximately 90% of these employees accepted Gateway's offer of employment. Day 2 Tr. 37:13–17.

58. Although Pasceri emphasized that Gateway hired these employees for the purposes of closing out Arlington's pipeline, Pasceri admitted that he did not intend to just fire all of the employees as soon as the pipeline closed. Day 1 Tr. 105:6–10, 89:8–10, 102:9–12. The shelf life of the pipeline was less than 90 days. Day 2 Tr. 71:1–3. However, only about 10–20% of the employees were let go in the first 30–60 days after the transaction. Day 2 Tr. 35:6–10.

### 4. Continuity of Arlington's Residential Loan Operations After the Transaction

59. After the transaction, Arlington's operations essentially continued as a form of "net branch" at Gateway. Day 1 Tr. 110:2–4, 139:5–10.

60. Leinhauser testified that Arlington's former business operations continued as the Arlington Branch of Gateway. Day 1 Tr. 114:3–8. After the transaction, Leinhauser served as an operator of a net branch that used the Arlington Capital Mortgage name as a d/b/a, kept the same Arlington phone numbers, and was staffed by some of the same employees and sales people that Leinhauser supervised at Arlington. Day 1 Tr. 112:2–20, 113:8–11. For the most part, in the transi-

tion from Arlington to Gateway, the former Arlington employees showed up to the same office, worked under the same name, and continued to work in the same markets—including the jumbo market—as they had before the transaction. Day 1 Tr. 112:21–24, 113:12–16.

61. Granahan also served as a branch manager for a former Arlington branch that essentially became a net branch of Gateway. Day 1 Tr. 139:7–10. The branch continued to operate with the Arlington name as a d/b/a. Day 1 Tr. 139:19–22. At the branch, Granahan supervised some of the same sales staff as at Arlington and they continued the same marketing efforts, with the same customer base as at Arlington. Day 1 Tr. 139:23–140:5.

62. Pasceri also agreed that Arlington's residential business operations essentially continued as the Arlington Branch of Gateway. Day 1 Tr. 210:13–15.

63. Although constrained in some respects, Arlington's former employees continued to originate jumbo loans—which were a niche specialty at Arlington—at Gateway. Day 1 Tr. 165:9–167:7.

64. Arlington's operations, for the most part, continued uninterrupted during the transition to Gateway. The APA required that:

> the Business shall be conducted in the same manner as heretofore conducted and only in the ordinary course, and [Arlington] shall use all commercially reasonable efforts to (i) preserve the business organization of [Arlington], (ii) keep available the services of the current officers and employees of [Arlington] that are engaged in the Business …, and (iii) maintain the existing relations with Customers, creditors, business partners and others having business dealings with [Arlington] in connection with the Business.

Pl.'s Ex. 6 at § 6.01(a). Pasceri asked for this provision and Arlington complied with it. Day 1 Tr. 98: 4–9; Day 2 Tr. 44:17–45:3, 46:11–16. A goal of the transaction was to ensure that nothing would interrupt Arlington's business so there would be a seamless transition to Gateway. Day 1 Tr. 134:17–20, 164:20–22. For the most part, Arlington's ongoing business continued at Gateway, and Granahan did not recall any loans that needed to be abandoned due to the transaction. Day 1 Tr. 136:16–21.

65. In connection with the asset purchase transaction, Gateway entered into two sublease agreements with Arlington. Pl.'s Ex. 31, 32. Through these agreements, Gateway sublet nine [11] of Arlington's former offices, including Arlington's headquarters in Bensalem, PA. *Id.*, Day 1 Tr. 107:3–6. The Master Sublease for the applicable office leases was a condition of the closing of the asset purchase transaction. Pl.'s Ex. 6 at § 3.02(d).

66. Although Gateway only kept some of these offices—including the Bensalem, Erie, and Allentown offices—for a limited period of time, Gateway continued operations at all of the Arlington offices initially and still operates at least one former Arlington office—the Princeton office—more than five

---

**11.** Despite the language in the agreement, Pasceri testified that Gateway only actually sublet 90–95% of the nine locations listed in the Master Sublease Agreement. *See* Pl.'s Ex. 31; Day 1 Tr. 106:22–24.

years after the alleged asset transfer. Day 1 Tr. 106:23–107:9, 221:5–11.

67. Gateway obtained the right to use the Arlington Capital Mortgage name as a d/b/a. Day 1 Tr. 162:8–10. Maintaining the Arlington name was important to avoid confusion to the borrowers of loans that were in the pipeline at the time Arlington sold it to Gateway. Day 1 Tr. 162:17–21.

68. Although the pipeline had a shelf life of less than 90 days, as least as late as 2011, Gateway's website listed two of its branches under the Arlington name. Pl.'s Ex. 33, 34; Day 2 Tr. 71:1–4. As late as July 2011, a branch called "Arlington Capital Mortgage–PA" was still listed under Gateway's Pennsylvania locations. Pl.'s Ex. 34. As late as August 2011, a branch called "Arlington Capital Mortgage–NJ" was still listed under Gateway's New Jersey Locations. *Id.* In August 2011, Gateway's online profile for Arlington Capital Mortgage–NJ—the former Arlington Princeton Branch—stated in the "About Us" section that: "As one of the oldest mortgage banking firms ... in Princeton, New Jersey, Arlington Capital Mortgage knows how to make home financing solutions happen." *Id.* The contact email-presumably that of Kenyon-remained an Arlington email address: kkenyon@arlington&1fcapital.com. *Id.*

69. Pasceri testified that Gateway continued to use the Arlington name for "some amount of time" after the pipeline closed, but "systematically closed the name down." Day 1 Tr. 163:17–22. Given the Gateway website's continued use of the Arlington name and email addresses more than three years after the transaction, the court does not find this testimony credible.

70. The APA provided that Arlington would transfer its telephone numbers to Gateway. Pl.'s Ex. 6 at § 2.01(d); Day 1 Tr. 96:6–8. The former Arlington branches of Gateway continued to use the same phone numbers that they had used prior to the asset purchase transaction. Day 1 Tr. 164:3–13.

71. The APA provided that Arlington would transfer the right to use its domain names and email addresses to Gateway, including arlingtoncapital.com, acmc-web.com, Thinkarlington.com, and Windsorfinancial.com. Pl.'s Ex. 6 at §§ 2.01(d), Schedule 2.01(d); Day 1 Tr. 96:9–10. After the transaction, Arlington's website redirected to Gateway's website. Day 1 Tr. 164:14–17. Thinkarlington.com redirected to Gateway's website until at least August 2010. Pl.'s Ex. 33.

### 5. The Arlington Entity After the Transaction with Gateway

72. After the asset sale transaction, Arlington had sold Gateway all of its tangible and intangible assets used to conduct its retail mortgage origination services. Pl.'s Ex. 6 at §§ 2.01, 4.03; Day 2 Tr. 74:5–8.

73. Arlington could no longer originate residential mortgage loans, because the four Arlington shareholders signed Agreements Not to Compete with Gateway that prohibited them from engaging in "Business Activities" within 150 miles of Horsham, Pennsylvania for three years. Pl.'s Ex. 10, 13, 16, 19; Day 2 Tr. 74:9–12. The agreements defined "Business Activities" as "the origination and sale of residential mortgages." Pl.'s Ex. 10, 13, 16, 19.

74. Russo's Agreement Not to Compete allowed Russo to invest and participate in several other enterprises he

owned and to participate in "the winding down of Arlington Capital." Pl.'s Ex. 10 at § 1(c).

75. Russo agreed that the Agreement Not to Compete only allowed him to wind down Arlington's business, but believed that he had some latitude in defining what exactly "winding down" entailed. Gateway did not require Russo to dissolve the business and Arlington did continue to generate some income. Day 2 Tr. 75:13–21. Arlington did not dissolve, continues to file tax returns, and still exists as an entity. Day 2 Tr. 100:14–18.

76. When asked if Arlington wound down, Russo stated that "[i]t was a different company after the sale than it was before, for sure." Day 2 Tr. 75:22–24. Russo intends to wind down Arlington some time before he dies, but does not feel any pressure to do so because his employment agreement with Gateway does not set a time table for winding down Arlington. Day 2 Tr. 83:17–24. In the meantime, Russo intends to maintain Arlington as an entity for use in case a business opportunity arises. Day 2 Tr. 83:6–12.

77. Leinhauser stated that Arlington does not have any business operations and that he "wouldn't characterize [Arlington] as being in the mortgage business for sure. It still exists as an entity, I suppose." Day 1 Tr. 128:12–14, 128:25–129:1. Granahan also agreed that Arlington's business operation ceased after the transaction because "we didn't do anymore lending, and that was our primary business...." Day 1 Tr. 158:22–25.

78. Leinhauser believed that, based on the agreement with Gateway, Arlington would not continue to originate mortgages after the transaction, that Arlington would not go forward or do anything after the transaction, and that Arlington would wind down after the transaction. Day 1 Tr. 118:16–119:11. Granahan stated that he understood that Arlington would wind down as a result of the transaction with Gateway. Day 1 Tr. 143:12–14.

79. After the transaction, Arlington had no employees and no offices of its own. Day 1 Tr. 129:11–14, 159:1–13; Day 2 Tr. 82:7–10. Since 2008, Arlington has paid neither distributions to shareholders nor wages to anyone. Day 2 Tr. 82:16–20.

80. Although Arlington had no assets, Russo continued to engage in one-off transactions under the Arlington Capital Mortgage name. Day 2 Tr. 83:25–84:8. While Kenyon was aware of these transactions, neither Leinhauser nor Granahan were apprised of this continued activity. Day 1 Tr. 130:3–12, 160:16–19; Day 2 Tr. 157:9–13.

81. Russo agreed that it was fair to say that he is the only one operating under the Arlington entity. Day 2 Tr. 83:25–84:2. Russo has not had much participation from Leinhauser or Granahan, but has kept in contact with Kenyon more regularly about Arlington. Day 2 Tr. 84:2–4. After the transaction, Kenyon estimates he was involved in six to twelve individual transactions in the five years following the transaction with Gateway, but no transactions in the past year. Day 2 Tr. 157:16–158:5. .

82. Prior to the transaction with Gateway, Arlington primarily engaged in residential mortgage lending for one to four family properties. Day 2 Tr. 99:1–2. However, Arlington also "would get involved in commercial transactions or other types of transactions where we ... saw both an op-

portunity and an ability to ... fulfill it." Day 2 Tr. 99:7–9. These other types of transactions included construction lending and bridge loans.[12] Day 2 Tr. 99:24–100:1. Russo described Arlington as "opportunistic." Day 2 Tr. 100:7. Although Arlington engaged in certain limited operations other than its mortgage origination business, Russo agreed that there were "not a lot" of them. Day 2 Tr. 76:24–77:21. Granahan was only aware of one or two commercial loan transactions between 2004 and 2008. Day 1 Tr. 158:17–20. Leinhauser did not recall Arlington doing any commercial loans. Day 1 Tr. 126:6–15.

83. After the transaction with Gateway, Arlington no longer engaged in its primary enterprise: originating residential mortgage loans. Arlington did, however, engage in a few one-off transactions. During his deposition, Russo stated that there were one to ten one-off transactions after the Gateway deal, and while he could not remember the exact number at trial, Russo testified that the number "was in that range." Day 2 Tr. 78:1–10. None of these transactions occurred within the last year. Day 2 Tr. 78:13–14.

84. Arlington's 2009 tax returns reveal that Arlington had $93,893 in cash at the beginning of 2009 and only $11,098 in cash by the end of 2009. Def.'s Ex. 11 at 4. Arlington's 2010 tax returns reveal that Arlington had only $10,702 in cash by the end of 2010. Def.'s Ex. 12 at 4. Arlington's 2011 tax returns reveal that Arlington had $13,839 in cash at the end of 2011. Def.'s Ex. 13 at 4. Arlington filed for an extension of time for its 2012 tax returns. Def.'s Ex. 14. Today Arlington has approximately $11,000 to $12,000 in its bank account. Day 2 Tr. 82:5–6.

85. While the fate of all of the cash Arlington received from Gateway is unclear, a substantial portion of the cash was spent on defending multiple lawsuits against Arlington. Day 2 Tr. 86:17–22; Day 1 Tr. 124:10–125:13, 155:15–157:2. The cash was also used to pay bills and professional fees and to fund a few of the one-off transactions that Russo engaged in. Day 2 Tr. 116:22–25.

86. In particular, Arlington spent "a lot" of the cash—approximately $100,-000—on the "very expensive" Bancorp litigation. Day 2 Tr. 86:10–16, 122:1–4; Day 1 Tr. 124:13–14. The Bancorp litigation commenced prior to the Gateway transaction and the APA explicitly listed the litigation as an excluded liability that Gateway would not be responsible for. Pl.'s Ex. 6 at § 2.03(b); Day 2 Tr. 84:12–25. Arlington also spent $60,000 on a case captioned *Classic v. Arlington*, and was involved with a few other smaller cases. Day 2 Tr. 122:5–15.

## C. The McNair Loan

### 1. The Loan Purchase Agreement Between Arlington and LBB

87. In August 2001, Arlington entered into a Loan Purchase Agreement ("LPA") with LBB. Pl.'s Ex. 21. Under the agreement, LBB agreed to buy mortgage loans "from time to time" from Arlington. *Id.* The agreement specifically incorporated a "Sell-

12. A bridge loan is a short term loan used when a borrower needs temporary financing to buy a new property when he or she has not yet sold his or her current property. The borrower would typically repay the bridge loan once he or she sells the property. Day 1 Tr. 125:21–126:2.

er's Guide." *Id.* The Seller's Guide is the primary document that governed the correspondent lending program and included various representations, warranties, and covenants made by Arlington. Pl.'s Ex. 22; Day 1 Tr. 18:8–13.

88. The Seller's Guide stated that LBB purchased the loans in reliance upon "the truth and accuracy of Seller's representations and warranties set forth in the Loan Purchase Agreement and this Seller's Guide." Pl.'s Ex. 22 at § 701. Under the Seller's Guide, Arlington represented that

> [n]o document, report or material furnished to [LBB] in any Mortgage Loan File or related to any Mortgage Loan (including, without limitation, the Mortgagor's application for the Mortgage Loan executed by the Mortgagor), was falsified or contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

*Id.* at § 703 ¶ 1.

89. The Seller's Guide further provided that in the event of a breach of any of the representations, warranties, or covenants resulting in damage to LBB, LBB may require Arlington to "repurchase the related Mortgage Loan (in the case of a breach of the representations, warranties or covenants contained in *Section 703* hereof or an Early Payment Default) ... at the Repurchase Price." *Id.* at § 710. In addition, the Guide stated that Arlington

> shall indemnify [LBB] ... from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that [LBB] may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement....

*Id.* at § 711.

90. Under this Loan Purchase Agreement, LBB bought the McNair Loan from Arlington.

91. LBB subsequently sold the McNair Loan to Lehman. LBB also assigned to Lehman the rights it had under the Loan Purchase Agreement—including any rights LBB had against Arlington. Pl.'s Ex. 23; Day 1 Tr. 19:11–15.

92. Section 8 of the Loan Purchase Agreement is a choice of law provision that provides that "[t]his Agreement and the Seller's Guide shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York...." Pl.'s Ex. 21.

### 2. The McNair Loan Transaction

93. On August 21, 2006, Daniel McNair filed a loan application with Arlington for a property in Suitland, Maryland. Pl.'s Ex. 1. On September 5, 2006, Arlington sold the McNair Loan to LBB for $210,630. Pl.'s Ex. 24, 5; Day 2 Tr. 141:21–25. Arlington provided McNair's loan application to LBB when LBB purchased the loan. Day 1 Tr. 20:3–6.

94. In McNair's August 21, 2006 loan application, McNair disclosed the amount of his mortgage debt and monthly mortgage payments for other properties that he owned, including a

property located at 1827 D St. NE, Washington, DC 20002 ("DC Property"). Pl.'s Ex. 1. McNair's loan application stated that he owed $158,471 in mortgage debt on the DC Property. *Id.*

95. The amount of McNair's mortgage debt on the DC Property is documented at three points in time:

- **June 26, 2006:** McNair refinanced the DC Property two months prior to his loan application with Arlington. The associated refinance document shows that, at that time, McNair owed $328,800 on the DC Property, with monthly payments of $2,603. Pl.'s Ex. 2.

- **August 21, 2006:** In McNair's loan application with Arlington, McNair represented that he owed $158,471 on the DC Property, with $1,360 in monthly mortgage payments; and

- **March 23, 2007:** A Notice of Foreclosure for the DC Property, dated March 23, 2007, reports that McNair owed a balance of $339,956.20 on the DC Property at that time. Pl.'s Ex. 38.

96. On August 26, 2009, Lehman sent Arlington a letter informing Arlington that it had breached its representations and warranties in the Loan Purchase Agreement and Seller's Guide. Pl.'s Ex. 26. Lehman's letter claimed that McNair's Loan contained a misrepresentation of debts because of the significant discrepancy between the amount of mortgage debt reported in McNair's August 2006 loan application ($158,471) when compared to his June 2006 refinance document ($328,800). *Id.* The letter demanded that Arlington repurchase the loan within 30 days. *Id.*

97. Arlington did not repurchase the McNair Loan from Lehman within thirty days of the date of the demand letter. Day 1 Tr. 36:20–21.

98. John R. Baker, III, who is an Assistant Vice–President Claims Manager for Lehman, believed that the three documents taken together—the refinance document, the loan application, and the foreclosure notice—indicate that McNair misrepresented his debt on the DC Property and that he owed more than $300,000 at the time of his loan application with Arlington. Day 1 Tr. 11:2–3, 32:1–33:21.

99. Baker, however, had no first-hand knowledge of whether McNair paid down, refinanced, or borrowed against the loan on his DC Property between June 2006 and August 2006 or between August 2006 and March 2007. Day 1 Tr. 63:20–64:1.

## II. CONCLUSIONS OF LAW

### A. *De Facto* Merger

▮ As a general rule, under Pennsylvania law,[13] "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *Phila. Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 308 (3d Cir.1985) (internal quotation marks omitted). There are four exceptions to this rule:

[W]here (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability, a successor corpora-

---

**13.** Both parties agree that Pennsylvania law controls the issue of *de facto* merger.

tion may be held responsible for the debts and liabilities of its predecessor. *Id.* at 308–09.[14] Lehman claims that the second exception applies and argues that the asset purchase transaction between Arlington and Gateway amounted to a *de facto* merger.

▬ The *de facto* merger determination is a matter of equity, designed to look beyond the contract. *Fizzano Bros. Concrete Prod., Inc. v. XLN, Inc.*, 615 Pa. 242, 42 A.3d 951, 968 (2012). Pennsylvania courts examine four factors to determine the existence of a *de facto* merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 956.

▬ In making the *de facto* merger inquiry, a court must "examine the substance of the transaction to ascertain its purpose and true intent." *Phila. Elec.,*

762 F.2d at 310 (citing *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir.1974) (Rosenn, J., concurring), *cert. denied* 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975)). "[B]ecause of the complex nature of corporate reorganizations and acquisitions the intrinsic nature of a transaction cannot be ascertained merely from the form by which it is structured." *Phila. Elec.,* 762 F.2d at 310. A court must therefore " 'refer not only to all the provisions of the agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable.' " *Fizzano Bros.,* 42 A.3d at 961–62 (quoting *Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25, 28 (1958)). Such an analysis "requires that a court look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences." *Id* at 968. A *de facto* merger "will always be subject to the fact-specific nature of the particular underlying corporate realities and will not always be evident from the formalities of the proximal corporate transaction." *Id* at 969. "[T]he elements of the *de facto* merger are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure." *Id.* "Although each of these factors is considered, all need not exist before a *de facto* merger will be deemed to have occurred." *Cont'l Ins. Co. v. Schneider, Inc.*, 810 A.2d 127, 135 (Pa.Super.Ct.2002) *aff'd,* 582 Pa. 591, 873 A.2d 1286 (2005).

---

**14.** " 'A fifth circumstance, sometimes included as an exception to the general rule, is where the transfer was without adequate consideration and provisions were not made for

creditors of the transferor.' " *Phila. Elec,* 762 F.2d at 309 (quoting *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 341 A.2d 174, 176 (1975)).

### 1. Continuity of Enterprise

■ The continuity of enterprise factor requires "a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations." *Fizzano Bros.*, 615 Pa. 242, 42 A.3d at 956. Merely continuing the business operations of the predecessor corporation is not sufficient. Continuity of management is also essential in order for continuity of enterprise to exist. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 469–470 (3d Cir.2006).

■ Gateway tries to argue that this factor is not met by characterizing the transaction as the simple purchase of a discrete asset—Arlington's pipeline of loans. Gateway claims that it acquired all of Arlington's other assets and its employees only because they were incidentally necessary to closing out the loan pipeline. Lehman argues more persuasively that Gateway bought much more than a discrete pipeline of loans. Rather, Gateway bought the ability to continue Arlington's entire loan production business and did in fact successfully continue that business. Lehman emphasizes that Gateway's CEO Pasceri himself testified that he not only wanted Arlington's current pipeline of loans but the ability to continue to generate that business in the future.

Looking at the transaction as a whole, Lehman has demonstrated continuity of personnel, management, physical location, assets, and general business operations sufficient to satisfy this factor. As delineated in the Court's findings of fact, Arlington's former offices continued to operate as the Arlington Branch of Gateway. For the most part, at the Arlington Branch of Gateway, the same personnel continued to carry out the same business operations, in the same markets, using the same assets, and at the same physical locations as

Arlington had prior to the transaction. Gateway offered employment to the vast majority of Arlington's employees, and most of those employees accepted the offers. Russo testified that while some employees were let go after the pipeline closed, most of them—eighty or more percent—remained employed with Gateway. The Arlington Branch of Gateway remained in the same offices, with the same phone numbers, using the Arlington name as a d/b/a. Arlington's website redirected to Gateway's website, which continued to designate two Gateway offices as "Arlington" offices until at least 2011.

Furthermore, virtually all of Arlington's assets transferred to Gateway. The APA unambiguously provides that Gateway purchased all of the "Assets Used in the Business," which "represent all of the assets used by [Arlington] to conduct its mortgage origination business as it is now being conducted." The APA even designated that "all cash in all accounts" be transferred to Gateway as a part of the transaction. It is unclear why a mere asset purchase would include such a term.

Additionally, the transition to Gateway occurred with minimal interruption to Arlington's ongoing business. The APA required Arlington to ensure the continuity of its general business operations

> and use all commercially reasonable efforts to (i) preserve the business organization of [Arlington], (ii) keep available the services of the current officers and employees of [Arlington] that are engaged in the Business ..., and (iii) maintain the existing relations with Customers, creditors, business partners and others having business dealings with [Arlington] in connection with the Business.

Pl.'s Ex. 6 at § 6.01(a). Granahan testified that a goal of the transaction was to en-

sure that nothing would interrupt Arlington's business so there would be a seamless transition to Gateway. When asked about the transition, Leinhauser stated that, for the most part, Arlington's former employees showed up to the same office, worked under the same name, and continued to work in the same markets as they had before the transaction with Gateway.

Arlington's former business operations, however, did not continue at Gateway without the involvement of Arlington's four executive officers/shareholders. In connection with the APA, Gateway brought over the four Arlington shareholders into management roles at Gateway, where they continued to manage the same branches that they had owned prior to the transaction. After the transaction, Russo—Arlington's CEO—became President of Gateway, in which capacity he participated in Gateway Senior Management Team meetings for two years. Russo was one of only three senior Gateway employees who received a cut of Gateway's overall profits. Although Kenyon (Arlington President), Leinhauser (Arlington Executive Vice President), and Granahan (Arlington Executive Vice President) did not have senior management roles at Gateway, they became branch managers who managed the former Arlington enterprise that continued as the Arlington Branch of Gateway. As branch managers, they had hiring and firing powers and managed some of the same employees as prior to the transaction.

In light of the foregoing, Gateway's argument that it bought only a discrete asset—the pipeline of loans—rings hollow. Arlington's *entire business* was its pipeline of loans and the assets and ability to continually generate new pipelines of loans. Put simply, the assets Gateway bought *are* the business. Thus, although Gateway did receive a pipeline of loans, it received much more than that—it received all of Arlington's assets used in its business and the ability to generate more business in the future using Arlington's name, personnel, former managers, assets, and business relationships. Lehman has demonstrated continuity of personnel, management, physical location, assets, and general business operations. The continuity of enterprise factor thus weighs in favor of Lehman.

### 2. Continuity of Ownership

The continuity of ownership factor of the *de facto* merger analysis is often stated as requiring "a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation." *Fizzano Bros.*, 42 A.3d at 956. In *Fizzano Bros. Concrete Prod., Inc. v. XLN, Inc.*, the Pennsylvania Supreme Court recently affirmed this factor is mandatory and that "the *de facto* merger exception *requires* 'some sort of' proof of continuity of ownership or stockholder interest." *Id.* at 969 (emphasis added). The *Fizzano* Court emphasized that that "some sort of" continuity is necessary "because 'corporate liability adheres not to the nature of the business enterprise but to the corporate entity itself. The corporate entity and its shareholders ultimately are responsible for the disposition of the corporation's assets and the payment of its debts.'" *Id.* at 968 (quoting *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir.1985)). Typically, even if one corporation sells to another all of its business operations, assets, and good will, the two corporations remain as distinct entities that are strangers—unless there is a continuity of shareholder interest. *See Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d at 1458. As the Third Cir-

cuit noted in *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 469 (3d Cir. 2006), the objective of the continuity of ownership requirement is to identify situations in which shareholders of a seller corporation retain an ownership interest in their assets after artificially cleansing those assets of liability and thus unfairly attempt to impose their costs or misdeeds on third parties. *See also United States v. Gen. Battery Corp., Inc.*, 423 F.3d 294, 306–307 (3d Cir.2005).

■ Although Pennsylvania law requires "some sort of continuation of the stockholders' ownership," this continuity of ownership need not be evidenced by an exchange of stock. The *Fizzano* Court found that

> such proof is not restricted to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Evidence of other forms of stockholder interest in the successor corporation may suffice; indeed, 15 Pa. C.S. § 1922(a)(3) [the state law governing corporate mergers] contemplates that continuing shareholder interest pursuant to a statutory merger may take the form of 'obligations' in lieu of shares in the new or surviving corporation.

*Id* at 969. The *Fizzano* Court concluded that the owners of the predecessor corporation need not receive shares of the successor corporation in the *de facto* merger context, because Pennsylvania's *statutory* merger provision does not require owners of the predecessor corporation to exchange their shares for shares of the successor corporation; the successor can pay them with cash, property, obligations, or other rights instead. *Fizzano Bros.*, 42 A.3d at 968; 15 Pa. Cons.Stat. Ann. § 1922 (allowing owners of a predecessor corporation to surrender their shares of stock for 'obligations' of the successor corporation, or 'cash, property, or rights' in lieu of shares

in the successor corporation). In light of Pennsylvania's *statutory* merger standard, the *Fizzano* Court decided that a *de facto* merger may also exist without an exchange of shares:

> Because the Corporation Law does not **always** require an exchange of shares, for a statutory merger ..., it would be incongruous to adopt a blanket rule that a *de facto* merger **would always** require a rigid showing that the shareholders of the predecessor corporation have exchanged their ownership interests for shares of the successor corporation.

*Fizzano Bros.*, 42 A.3d at 968. The *Fizzano* Court held that the "continuity of ownership prong of the *de facto* merger analysis certainly may not be more restrictive than the relevant elements of a statutory merger as contemplated by our legislature." *Id.* In sum, although "some sort of" continuity of ownership is required, it need not take the form of stock ownership.

■ The *Fizzano* Court recognized that "transactional realities sometimes require a scrutiny that extends the focus beyond the confines of the immediate consequences of the proximal asset purchase agreement." *Id.* at 968–69. Thus, in deciding whether a *de facto* merger exists, a court is required to "look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences." *Fizzano Bros.*, 42 A.3d at 968. In so doing, I find that the four Arlington shareholders continued to have an ownership interest in their assets after the transaction with Gateway. Before the transaction, the Arlington owners shared in Arlington's profits as shareholders. After the transaction, they continued to share in the profits of the Arlington Branch of Gateway.

As a condition of the APA, each of the four Arlington shareholders signed an employment agreement with Gateway.

Russo, Arlington's majority shareholder, however, received the most lucrative employment deal—he was not only entitled to share in the profits of the Arlington Branch of Gateway, but shared in the profits of Gateway in its entirety. Russo's employment agreement contractually entitled him to five percent of Gateway's total profits. It also entitled him to ten percent of the profits of the Arlington Branch of Gateway, which included not only the former Arlington offices, but "any offices to which any of ... [Arlington's] business operations are transferred and any new offices opened with respect to such business operations." Pl.'s Ex. 9 at § 4(b). The agreement specified that Russo would receive these "Arlington Branch" profit sharing payments for the first three years regardless of whether he remained employed at Gateway. After three years, if still employed, Russo would receive fifty percent of Gateway's profits from the "Arlington Branch"—a percentage roughly equivalent to his original ownership interest in Arlington. Russo was also entitled to special severance benefits and change of control payments tied to the Arlington Branch's profitability. In essence, after the transaction, Russo maintained an ownership interest in Arlington's former assets after cleansing those assets of liability via the transaction with Gateway.

Russo, however, was not the only shareholder to receive contractual profit sharing rights at Gateway. The Branch Manager Employment Agreements signed by each of the three minority shareholders also entitled them to share in the profits of the former Arlington offices. Each of the three shareholders received the net profits from the branch they managed, and both Granahan and Leinhauser testified that their situation was similar to that of a small business owner. In this way, the three shareholders also maintained an ownership interest in Arlington's former assets after the transaction.

The *Fizzano* Court found that a continuing shareholder interest in the successor corporation may take the form of obligations, cash, property, or rights in lieu of shares in the new or surviving corporation. The Arlington shareholders' agreements entitling them to share in the profits derived from their former Arlington assets satisfy this requirement—these "obligations" allowed Arlington's shareholders to continue to have an ownership interest in Gateway after the transaction. Although the Arlington shareholders did not receive stock in Gateway, this is unsurprising given that Gateway is a limited partnership and Michael Karp essentially owns all of the partnership interest in Gateway. Thus, instead of shares or partnership interests (in a company with a single partner), the Arlington owners received profit sharing rights, entitling them to a share of the profits.

In addition to these profit sharing rights, Arlington's four shareholders received significant lump sum payments and forgivable loans as a part of their Agreements Not to Compete with Gateway.[15]

15. Gateway argues that these payments could not serve as compensation for the value of the shareholder's ownership interests in Arlington because they are not proportional to their respective numbers of shares. The *Fizzano* Court did not directly address whether shareholders' ownership must be proportional before and after the transaction. However, in light of its conclusion that the factor may be satisfied by potentially non-numerical interests—such as obligations or rights—instead of shares, it seems unlikely that the Pennsylvania Supreme Court would require direct proportionality.

Furthermore, the Third Circuit addressed a similar issue in *United States v. Gen. Battery Corp., Inc.,* 423 F.3d 294 (3d Cir.2005). In *Gen. Battery,* the court evaluated corporate

While all the shareholders agree these payments were, at least in part, consideration for their agreements, Granahan testified that these payments were also, in part, compensation for the fact that the transaction rendered his shares worthless. Granahan, unlike Kenyon and Russo, no longer works for Gateway and appears to be a disinterested third party. I thus find Granahan's testimony to be credible. Although Leinhauser did not testify that the payments were compensation for his stock, he did admit that his shares were worthless. Indeed, Arlington has paid no distributions to its shareholders since shortly after the transaction in 2008, and Arlington has continued to possess only a minimal amount of cash since 2009.

It remains unclear what proportion of these payments served to compensate the Arlington shareholders for the value of their ownership interests. However, it is more likely than not that some element of these payments served to compensate the shareholders for the value of their stock, given Granahan's testimony, the significant value of the lump sum payments and forgivable loans, and the fact that the transaction rendered the company's stock virtually worthless. Even without these payments, however, the Arlington shareholders retained an ownership interest in their assets after the transaction by virtue of their contractual profit sharing entitlements. Continuity of ownership thus exists, and this element of the *de facto* merger analysis is satisfied.

### 3. Cessation of Ordinary Business Operations

 The third factor of the *de facto* merger analysis is often stated as a requirement that the "seller corporation cease[ ] its ordinary business operations, liquidate[ ], and dissolve[ ] as soon as legally and practically possible." *Fizzano Bros.*, 42 A.3d at 956. Through this factor, "[t]he *de facto* merger doctrine recognizes that an essential characteristic of a merger is that one corporation survives while the other ceases to exist." *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 470 (3d Cir.2006). Under Pennsylvania law, however, a corporation need not completely cease to exist. Courts have found this factor to be satisfied when the predecessor corporation does not dissolve, but is reduced to an assetless shell. *See Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 368–69 (3d Cir.1974) ("Denying [plaintiff] the right to sue [the successor] because of the barren continuation of [the predecessor] after the exchange with [the successor] would allow a formality to defeat [plaintiff]'s recovery. Although [the predecessor] technically existed as an independent corporation, it had no substance.") (applying Pennsylvania law); *Com. v. Lavelle*, 382 Pa.Super. 356, 555 A.2d 218, 228 (1989) ("There was also a cessation of ordinary business by [the predecessor] shortly after the formation of [the successor], and, although the corporation was not dissolved, it was reduced to an assetless shell."); *Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F.Supp.2d 304, 315 (E.D.Pa.2007) ("The predecessor corporation need not actually dissolve; reduction to an assetless shell is sufficient.") (applying Pennsylvania law). While this factor may be met if the corporation *as a whole* ceases its ordinary busi-

liability under federal law, but utilized the same *de facto* merger standard as that used by the majority of states—including Pennsylvania. Examining the majority *de facto* merger standard, the *Gen. Battery* Court concluded that "successor liability [does not] necessarily turn on the seller's percentage interest in the buyer," and that rather "the critical 'continuity of ownership' inquiry appears to be whether the owners retained some ongoing interest in their assets." 423 F.3d at 307.

ness operations, it is not sufficient for only one *division* of a corporation to cease its operations. In *Berg Chilling*, for instance, the Third Circuit found that this factor was not met where one division of a corporation ceased its operations after all of its assets were sold to another company, but the larger corporation maintained other divisions that it continued to operate for years. 435 F.3d at 470.

In the instant case, Arlington neither dissolved, nor ceased all activity, and continued to exist as an entity that filed tax returns and defended law suits. Although Arlington did not formally dissolve, however, Arlington retained no employees, offices, or assets of substance after the transaction. Arlington also ceased its *ordinary* business operations: Arlington discontinued its residential mortgage origination business—its primary enterprise—as required by the Arlington shareholders' Agreements Not to Compete. Furthermore, by the end of 2009, Arlington had essentially devolved into an assetless shell. Its cash assets were virtually depleted and only $11,000 remained in the bank. In the years since 2009, Arlington has seen little fluctuation in its cash assets and continues to exist as an assetless entity. Arlington has not made disbursements to shareholders since shortly after the transaction, and two of Arlington's shareholders testified that their ownership interest was worthless.

After the transaction with Gateway, however, Russo (with some involvement from Kenyon) continued to use the Arlington entity as a vehicle for one-off transactions outside of the residential mortgage origination sphere. Russo estimates that he conducted somewhere in the range of one to ten of these transactions. Leinhauser and Granahan—two of the four shareholders—were not even aware of these one-off transactions and had believed that

Arlington would "wind down" after the sale. Russo, himself, stated that it was fair to say that he is the only one operating under the Arlington entity. Although Russo did continue to use the Arlington entity to take advantage of a few opportunistic transactions outside of the residential mortgage origination sector, the deal with Gateway essentially required Arlington to cease its normal business operations and rendered Arlington an assetless shell within two years following the transaction.

While it is clear that Arlington did not completely cease all activities after the transaction, it is also clear that Arlington's minimal level of activity did not rise to the level of that found by the Third Circuit in *Berg Chilling*. Unlike the corporation in *Berg Chilling*, Arlington did not just sell one division of its business and continue to operate the other divisions in the ordinary course of business. Rather, Arlington's ordinary business operations did cease, but the majority shareholder of Arlington continued to use the entity to engage in a few one-off transactions. For all intents and purposes, Arlington was not carrying on an independent business after the merger. Although this factor is the most debatable of the factors, I find that it weighs slightly in favor of Lehman.

4. **Assumption of Liabilities Ordinarily Necessary for the Uninterrupted Continuation of Normal Business Operations**

To satisfy the fourth *de facto* merger factor, the purchasing company must "assume[ ] those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Fizzano Bros.*, 42 A.3d at 956. Courts have found this factor satisfied where the purchasing entity assumes the liabilities on the seller's balance sheet as well as the seller's contractual obligations. *See Gen.*

*Battery Corp., Inc.,* 423 F.3d at 308 (finding factor met where the parties' "agreement expressly provided that [the successor] would assume [the predecessor]'s contractual obligations and all other obligations appearing on [the successor]'s balance sheet"); *Com. v. Lavelle,* 555 A.2d at 228 (factor met where successor assumed accounts payable and contracts and continued insurance policy). As demonstrated by the Asset Purchase Agreement, the Assignment, Delegation, and Assumption Agreement, and Pasceri's testimony, Gateway assumed substantially all of Arlington's debt and liabilities related to its ongoing loan origination business, including obligations on its balance sheet, Arlington's warehouse liabilities, and "substantially all of the contracts, liabilities and obligations of [Arlington] relating to [Arlington]'s business and operations...." Pl.'s Ex. 30. Additionally, Gateway does not contest this factor in its post-trial briefing and does not address it in its proposed findings of fact and conclusions of law. I thus find that the fourth factor of the *de facto* merger analysis is satisfied because Gateway assumed Arlington's liabilities necessary for the uninterrupted continuation of Arlington's normal business operations.

## B. McNair Loan

■ The Loan Purchase Agreement between Arlington and Lehman contains a choice-of-law clause providing that New York law governs the construction and enforcement of the contract. "Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994). In order to demonstrate that Arlington breached the LPA, Lehman needed to prove that Arlington was contractually ob-

ligated to repurchase the McNair Loan, because the McNair Loan application "contain[ed] any untrue statement of fact or omit[ted] to state a fact necessary to make the statements contained therein not misleading." Pl.'s Ex. 22 at § 703 ¶ 1.

■ Lehman has failed to prove that Arlington breached the LPA between the two parties, because Lehman failed to prove the McNair Loan application contained a misrepresentation that would obligate Arlington to repurchase the loan. Lehman argues that McNair misrepresented the amount of debt he owed on the DC Property in his loan application with Arlington because of the discrepancy between the amount of mortgage debt reported in McNair's August 2006 loan application ($158,471) when compared to his June 2006 refinance document ($328,800) and the March 2007 Notice of Foreclosure ($339,956.20). In support of its case, Lehman provided three documents that state the amount McNair owed on the DC Property at three points in time:

- **June 26, 2006:** The refinancing document for the DC Property showed that McNair owed $328,800;

- **August 21, 2006:** McNair's loan application with Arlington represented that he owed $158,471; and

- **March 23, 2007:** The notice of foreclosure for the DC Property showed that McNair owed $339,956.20.

However, Baker—Lehman's only witness—could not confirm or deny whether McNair paid down, refinanced, or borrowed against the loan on his DC Property between June 2006 and August 2006 or between August 2006 and March 2007. Baker did not familiarize himself with the McNair Loan until after the commencement of this litigation and had no firsthand knowledge about the loan application

or whether the alleged misrepresentation had occurred. Furthermore, McNair neither testified at trial, nor was deposed by the parties. Without more evidence, the three documents provided by Lehman do not prove by a preponderance of the evidence that McNair misrepresented his debt on the DC Property in his August 2006 loan application with Arlington.

Gateway is therefore not liable for the damages associated with the McNair Loan.

### C. The Pimentel and Steinhouse Loans

At summary judgment, I found that Arlington breached its indemnification agreements with Lehman with respect to the two Pimentel Loans and the Steinhouse Loan. I determined that the damages associated with these breaches is as follows:

| Loan | Total Loss Before Prejudgment Interest |
|------|----------------------------------------|
| Pimentel (# 2680) | $67,143.68 |
| Pimentel (# 2672) | $163,869.76 |
| Steinhouse (# 2995) | $217,519.64 |

I also found that prejudgment interest would accrue at a rate of 6 percent per annum. Gateway is thus liable to Lehman in the amount of $448,533.08 plus 6% prejudgment interest.[16]

### III. CONCLUSION

All four factors of the *de facto* merger analysis individually weigh in Lehman's favor, and, taken together, the facts relevant to each of these factors lead to the conclusion that a *de facto* merger occurred between Arlington and Gateway. Furthermore, equitable considerations also weigh in favor of finding that a *de facto* merger occurred. When faced with financial hurdles and the potential loss of Arlington's warehouse capacity, Arlington's shareholders joined with Gateway, where they were largely able to keep their business and sales force intact and continue to manage the former Arlington offices as the Arlington Branch of Gateway. Significantly, they were able to continue profiting off their former assets, while at the same time cleansing those assets from liability by selling them to Gateway via an asset purchase agreement. Gateway also received

significant benefits from the transaction in the form of increased production and profits. Gateway received much more than an asset—it essentially acquired an entire company, while leaving behind that company's liabilities. In light of the realities of this transaction, it would be inequitable to allow the two companies to avoid Arlington's obligations to its creditors. I thus conclude that the transaction between Gateway and Arlington amounted to a *de facto* merger between the two companies under Pennsylvania law. Gateway is thus liable for Arlington's breach of the indemnification agreements associated with the Pimentel and Steinhouse loans in the amount of $448,533.08 plus 6% prejudgment interest. Lehman did not carry its burden with respect to the McNair Loan. Gateway is therefore not liable for the damages associated with the McNair Loan.

### ORDER

**AND NOW,** this 17th day of December, 2013, it is **ORDERED** that, pursuant to the accompanying Findings of Fact and Conclusions of Law, **JUDGMENT IS ENTERED** in favor of Plaintiff Lehman

---

**16.** Lehman also seeks attorneys' fees, however, the parties did not present evidence on or argue this issue at trial. Lehman must therefore file a motion under Fed.R.Civ.P. Rule 54.

Brothers Holdings, Inc. with respect to the two Pimentel Loans and Steinhouse Loan in the amount of $448,533.08 plus 6% prejudgment interest. It is further **ORDERED** that **JUDGMENT IS ENTERED** in favor of Defendant Gateway Funding Diversified Mortgage Services, L.P. with respect to the McNair Loan.