[No. 5581–7–III.  Division Three.  November 29, 1984.]

GARY R. BALLO, ET AL, *Respondents*, v. JAMES S. BLACK CO., INC., ET AL, *Appellants*.

*Robert J. Crotty, Terence R. Whitten, David K. DeWolf,* and *Lukins, Annis, Shine, McKay, Van Marter & Rein,* for appellants.

*John P. Giesa, Reed & Giesa,* and *Richard B. Price,* for respondents.

*Kenneth O. Eikenberry, Attorney General, John R. Ellis, Deputy,* and *Jon P. Ferguson, Assistant; Michael J. Myers* on behalf of Mountain States Legal Foundation; and *John C. Guadnola* and *Thomas L. Fishburne* on behalf of National Association of Realtors, Washington Association of Realtors, and Spokane Board of Realtors, amici curiae.

GREEN, A.C.J.—James S. Black and James S. Black, Inc., appeal a decision in a civil antitrust action involving an alleged conspiracy in restraint of trade and unfair competition in the development of a residential area in Spokane. Initially, this was a class action, but the class was decertified leaving only the Ballos as plaintiffs.

The issue which we find dispositive of this appeal is whether, after entering findings of fact, the court erred in concluding there were per se violations of RCW 19.86.020–.030. We have considered this issue based solely on the court's findings and reverse.

While the trial court entered 85 findings of fact, the following are pertinent to the Ballos: James S. Black, Inc., is a real estate brokerage and development firm. James S. Black is a licensed real estate broker. Lowell Stack is an independent residential home building contractor, as is Orville Mark. In 1967, Mr. Black, Lowell Stack, Don Stack, Mr. Mark, Guy Wilcox and Lyle Wilcox incorporated Comstock Development Corporation (CDC). Each owned 20 percent of the shares of CDC except Guy and Lyle Wilcox, who owned 10 percent each. Mr. Black was the president of CDC; Mr. Mark and Lowell Stack were also officers. CDC, with capital received from the shareholders and other borrowed capital, purchased undeveloped land in the Comstock area. When CDC was formed, Lowell Stack and Mr. Mark expected the corporation would supply them with land upon which to construct homes; the Wilcox brothers anticipated CDC would supply them with excavation work; and Mr. Black expected his real estate company would market the Comstock subdivision.

CDC's sole function has been the development and sale of residential building lots. CDC carefully controlled the numbers, sizes, styles and prices of homes built in the area. In 1976 and thereafter, the shareholders of CDC who were also builders selected the lots in rotation among themselves. No other builders were involved after 1976 except Dave Mark and Paul Rodeen, close relatives of two officer shareholders. Shortly after the lots were selected, earnest money agreements were executed between CDC and the builder. "It was agreed that the builders would pay [CDC] a nominal down payment of $25.00 to hold the lot until it was 'sold' by the builder." When a customer desired to purchase a lot and have a custom home built, the builder to whom the lot had been allocated would execute an earnest money agreement with his customer for the sale of the lot before construction of the home commenced. At the time of closing, CDC deeded the lot directly to the builder's customer.

In 1977, Gary and Kristin Ballo, working with Glenmar

Freeman of Sullivan Realty, decided to purchase a lot in the Comstock area. The lot was offered to the Ballos for $11,000 by Lowell Stack. The Ballos agreed to that price without negotiation. The closing agent paid CDC $9,350 and Lowell Stack the difference of $1,650, pursuant to CDC's apparent authorized builder's discount. The lot was deeded directly to the Ballos from CDC. The Ballos agreed to the following conditions: (1) use the services of the builder to whom the lot was allocated; and (2) pay 6 percent commission on the combined price of the lot and the estimated price of the house to be constructed.

In October 1978 the Ballos filed a class action complaint against James S. Black, Inc., Sullivan Realty, Inc., CDC and Messrs. Black, Stack and Mark. Count 1 alleged a price fixing and tying arrangement in violation of the Consumer Protection Act (CPA) and count 2 alleged breach of fiduciary duty and constructive fraud. The Ballos sought certification of the class of all purchasers of speculative and custom homes in the Comstock subdivision. The court determined CR 23(a) was satisfied but certified a smaller class consisting of the Ballos and other purchasers of custom homes built by Stack or Mark in the Comstock area. A notice was sent to purchasers in the potential class informing them of their rights, including the right to opt out. Shortly after the notices were received, the court learned that Messrs. Black, Stack and Mark had been responsible for personal contact with most of the potential class members. The court ruled this contact violated the spirit of the certification order and appointed two special masters to determine whether the contact influenced the class members' decision to opt out, as a vast majority of them had done. Following the special masters' report, the court found the potential class members were supplied with sufficient information to make a voluntary and intelligent decision, the class was decertified and this action proceeded with the Ballos as sole plaintiffs. Consequently, we are concerned only with the Ballos and the circumstances surrounding the purchase of their lot in the Comstock area.

Following a bench trial, the court determined the defendants combined and conspired with other builders to fix prices of Comstock lots and homes in restraint of trade, RCW 19.86.030, and constituted an unfair method of competition, RCW 19.86.020. Such price fixing, the court concluded, was a per se violation of these statutes. The court found that as a result of the agreement between Black, Stack and Mark to establish the minimum price at which the lots would be offered for sale by CDC to the public, the Ballos were damaged in the amount of $1,650—the difference between what Ballos paid for the lot and CDC's price to Lowell Stack. It was also determined the agreement to charge a 6 percent commission on custom homes damaged the Ballos in the amount of $5,500. On the Ballos' motion, a hearing was held and the court awarded them treble damages of $21,450 plus costs and attorney fees in the amount of $213,731.48. A $110,000 settlement was approved between the Ballos and all defendants except Mr. Black and James S. Black, Inc. The settlement amount was deducted and judgment for $125,181.48 was entered against Mr. Black and his company. A permanent injunction was also entered enjoining Black and James S. Black, Inc., from certain activities when acting in concert with two or more builders.

Mr. Black and James S. Black, Inc., appeal claiming the court blindly applied the per se rule, failed to analyze the relationship of the alleged conspirators, and erroneously condemned legitimate restraints established by a joint venture development corporation. The Ballos cross–appeal challenging the court's decertification of the class.

The Consumer Protection Act was enacted in 1961 to promote free competition in the marketplace for the ultimate benefit of the consumer. *State v. Black*, 100 Wn.2d 793, 799, 676 P.2d 963 (1984). RCW 19.86.030 provides: "Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." This provision is patterned after and contains nearly identical language to the federal

Sherman Antitrust Act, 15 U.S.C. § 1.[1] When the Legislature enacted the CPA, it anticipated our courts would be guided by the interpretation given by the federal courts to the corresponding federal statutes. RCW 19.86.920.

In evaluating conduct allegedly in violation of the Sherman Antitrust Act, federal courts have applied two tests. The "rule of reason" test requires the fact finder to decide whether under all the circumstances of the case, the restricted practice imposes a reasonable restraint on competition. *Arizona v. Maricopa Cy. Med. Soc'y,* 457 U.S. 332, 344, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982). The second approach, the "per se" test, is premised upon the principle that certain agreements or practices are so plainly anticompetitive and so often lacking any redeeming virtue that they are conclusively presumed illegal without further examination under the rule of reason test generally applied in the Sherman Act cases. *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 9, 60 L. Ed. 2d 1, 99 S. Ct. 1551 (1979); *National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 55 L. Ed. 2d 637, 98 S. Ct. 1355 (1978); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977). Traditionally, practices which are deemed to be unlawful per se are price fixing, division of markets, group boycotts and tying arrangements. *Arizona v. Maricopa Cy. Med. Soc'y, supra; Northern Pac. Ry. v. United States,* 356 U.S. 1, 2 L. Ed. 2d 545, 78 S. Ct. 514 (1958). When conduct is found to fall within one of these categories, any explanation of why the act was done or what its effect might be in a particular case is of no consequence or materiality. *Plymouth Dealers' Ass'n v. United States,* 279 F.2d 128, 131 (9th Cir. 1960).

However, not all arrangements among actual or potential competitors that impact prices are per se viola-

---

[1]15 U.S.C. § 1 provides in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

tions of the antitrust laws. As the Court said in *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. at 9:

> [Price fixing] is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price." . . . Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act. Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label "*per se* price fixing."

(Citation omitted.) And, at page 23: "Joint ventures and other cooperative arrangements are . . . not usually unlawful, at least not as price–fixing schemes, where the agreement on price is necessary to market the product at all." Thus, agreements between members of a joint venture are subject to scrutiny under the rule of reason, *Copperweld Corp. v. Independence Tube Corp.,* __ U.S. __, 81 L. Ed. 2d 628, 104 S. Ct. 2731, 2740–41 (1984), and are upheld if there are legitimate business reasons for the activity. *North Am. Soccer League v. National Football League,* 670 F.2d 1249, 1259 (2d Cir. 1982) (citing *Standard Oil Co. v. United States,* 221 U.S. 1, 55 L. Ed. 619, 31 S. Ct. 502 (1911)); *McElhinney v. Medical Protective Co.,* 549 F. Supp. 121, 132 n.7 (E.D. Ky. 1982); 70 Cal. L. Rev. 595, 657 (1982). Furthermore, RCW 19.86.920, which provides:

> It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest . . .

supports the conclusion this case should be evaluated pursuant to the rule of reason. We proceed to do so based on the findings of fact entered by the trial court.

The essential elements of a joint venture are: (1) a contract, express or implied; (2) a common purpose; (3) a community of interest; and (4) an equal right to control. *Paulson v. Pierce Cy.,* 99 Wn.2d 645, 654, 664 P.2d 1202

(1983); *Goeres v. Ortquist,* 34 Wn. App. 19, 21, 658 P.2d 1277 (1983). "An ownership or proprietary interest in the subject matter of the enterprise by all parties is not essential to creation of a joint venture." *Paulson v. Pierce Cy., supra* at 655.

Here, Black, Mark, the Wilcoxes and the Stacks agreed to enter into a venture to purchase, develop and sell residential lots in the Comstock Addition to Spokane. All the elements of a joint venture are present. To implement the venture, they formed CDC, a closely held corporation. If the corporation were dissolved, the joint venturers would have owned the land. These joint venturers anticipated CDC would supply them with either building, excavation or real estate marketing work. To market the lots in the subdivision these joint venturers, who in reality owned undivided interests in the lots, of necessity had to agree upon the sale price of each lot, which they did. As noted in *Broadcast Music, Inc.,* this is not the type of price determination that is forbidden by antitrust laws.

Further, there were legitimate business reasons for what occurred and what the Ballos complain was injurious to them. The trial court found (1) through the hard work and imaginative foresight of the shareholders, CDC achieved a high degree of success in its effort to sell the subdivided property; (2) there were sound reasons for limiting the annual number of lots sold; (3) the services of James S. Black, Inc., were necessary for the ultimate success of Comstock and therefore it was entitled to be paid for its services; (4) the 6 percent real estate commission was paid to CDC which in turn paid James S. Black the 6 percent commission; and (5) the lot the Ballos purchased was deeded directly to them from CDC. These findings establish that CDC's activities were legitimate and necessary to accomplish the purposes of the joint venture.

The rule of reason analysis also requires consideration of the impact of the activity upon competition in the relevant geographic market. *Gough v. Rossmoor Corp.,* 585 F.2d 381 (9th Cir. 1978), *cert. denied,* 440 U.S. 936, 59 L.

Ed. 2d 494, 99 S. Ct. 1280 (1979); *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 142–43 (3d Cir. 1978). *See generally United States v. First Nat'l Bank & Trust Co.*, 376 U.S. 665, 667–68, 12 L. Ed. 2d 1, 84 S. Ct. 1033 (1964); *Times–Picayune Pub'g Co. v. United States*, 345 U.S. 594, 97 L. Ed. 1277, 73 S. Ct. 872 (1953). It is essential that the geographic market be defined and the burden of establishing it rests on the plaintiff. *Gough v. Rossmoor Corp., supra* at 385, 389; *see also Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 53 n.21. The relevant geographic market for purposes of antitrust law is determined, in part, by the area to which the purchaser can reasonably turn to obtain the product. *Gough v. Rossmoor,* at 389.

Here, while the court found the "[l]ots and new homes offered for sale in the Comstock area are a separate, unique, identifiable, exclusive portion of the Spokane real estate market", it also found "[t]here were some homes in other real estate developments in the Spokane County area which were comparable in quality, size and price range to some homes in the Comstock area"; and that "[p]rior to deciding to purchase in Comstock, [the Ballos] considered new and used homes throughout Spokane County . . ." and "with the assistance of Glenmar Freeman of Sullivan Realty, they examined various properties." No error was assigned to these findings; therefore, they are verities. Since the Ballos examined properties in the Spokane area, it was the relevant market. The Comstock area comprised only about 240 lots and any price fixing impact on the relevant market was minimal, if not nonexistent.

Thus, we hold that because (1) the land in the Comstock area was actually owned by Black, Stack, Mark, and the other two minor shareholders in the name of CDC as a joint venture, and (2) the Comstock area occupied a minuscule portion of the geographic market, Spokane County, the setting of the price for the sale of lots and the 6 percent real estate commission paid to CDC were reasonable and did not violate RCW 19.86.030.

Finally, RCW 19.86.090 provides that a private citizen who brings an action under the CPA must show injury to his business or property. The court found two other agreements to be per se violations of RCW 19.86.020 and .030. The first concerned the sale of lots, prior to 1973–74, by CDC to the general public. Since the Ballos purchased their home after this alleged practice was discontinued, they do not have standing to challenge it. The second agreement related to increasing the minimum size of the homes above that specified in the covenants. The court found this agreement in effect increased the minimum base price at which homes could be offered in Comstock. This alleged conduct did not affect the Ballos. They contracted to have their house constructed at a size exceeding both the minimum size requirements of the covenant and the size requirement in the builders' agreement. Since the Ballos failed to show any injury to either their business or property by reason of these two agreements, it was error to hold they were per se violations of the act.

Further, we find no abuse of discretion in the court's decertifying the class action or requiring defendants to pay for the services of a special master.

In summary, the Ballos were not damaged. After searching for and considering other comparable properties in Spokane, they selected a lot and house plan in the Comstock area. Having made that choice, it is apparent the Comstock area was competitive with other comparable areas in Spokane County. The Ballos obtained what they bargained for at a price they agreed to pay. There was no unreasonable restraint involved.

In light of our holding, we need not consider the parties' other contentions.

Reversed.

EDGERTON, J. Pro Tem., concurs.

McINTURFF, J. (dissenting)— I respectfully dissent because I disagree with the majority's characterization of

Black, Stack and Mark as members of a joint venture who could legitimately fix prices on the lots in question.

The following additional facts are pertinent to my analysis: The sole function of Comstock Development Co. (CDC) was the development and sale of residential building lots. CDC never owned, built or sold any houses. In its early years, CDC was faced with low market demand and substantial mortgage payments. In order to meet its financial obligations from 1967 to the mid–1970's, CDC sold lots to the general public in competition with the builders who had purchased lots from it. These builders included the Stacks and Orville Mark, shareholders in CDC, and other, private builders.

Sometime during 1973 or 1974, the shareholders agreed CDC would no longer offer lots for sale to builders in general or to the public. From that time on, lot sales were restricted to the two shareholder builders and four non–shareholder builders.[2] These builders met at least annually and allocated the lots then available on a rotation basis. Black, Stack and Mark met periodically to establish minimum prices at which the lots would be offered for sale, through the builders, to the general public. Simultaneously, a second price was established for each lot which reflected a 15 percent discount from the minimum offering price. It was understood and agreed that the minimum prices were the starting point for builder–consumer sales and were 15 percent higher than the amount CDC was willing to sell and the builders were willing to pay for the lots.

In the early years of CDC, if a consumer wanted to build a custom home, the only real estate commission involved would be a 6 percent commission paid by CDC to James S. Black, Inc. (Black, Inc.), based on the sale price of the *lot*. During these years, no commissions were paid on the value

---

[2]These non–shareholder builders were Don O'Connell, who participated from 1974 to 1976, George Dullanty, who participated in 1974 and 1975, Dave Mark, who participated from 1974 to 1981, and Paul Rodeen, who participated from 1978.

of a completed custom home. After 1973–74, lots were offered to consumers on two conditions: first, the consumer had to agree to have his custom home built by the builder who had been allocated the lot. Second, he had to agree to pay a 6 percent commission to Black, Inc., on the price of the lot *and* the estimated cost of the custom home. This 6 percent commission was charged even though the house was not constructed until after the consumer had purchased the lot, and in some instances, when Black, Inc., had performed no services beyond the initial lot sale. The admitted purpose of the 6 percent commission on custom homes was to *equalize* the prices of custom and speculative homes so that the custom home buyer did not enjoy an advantage over the speculative home buyer.[3]

The Comstock lot which the Ballos selected in 1977 was a lot that had been allocated to Stack, a shareholder builder. Previously, CDC had agreed to sell and Stack had agreed to pay $9,350 for the lot. The lot was offered to the Ballos for $11,000, the minimum price set by Black, Stack and Mark. The closing agent paid CDC $9,350 and paid Stack the $1,650 difference. The Ballos did not see the deed at closing and did not learn until later that CDC had previously agreed to sell the lot for $9,350.

The Ballos contracted with Stack to build them a custom home on their lot. To the contracted price, a commission of $5,500 was added which was split 50–50 between Black, Inc., and Sullivan Realty. Neither Black, Inc., nor Sullivan Realty, Inc., performed any services other than those connected with the sale of the lot.

---

[3]In a letter on December 19, 1978, to the National Association of Realtors seeking their "legal muscle", Black explained the rationale underlying the commission on custom homes:

It is vitally important to this marketing program and to the builders involved that any custom houses built in the area carry the same costs of this marketing program as the speculative houses with which it competes. If this were not true, the builder would find that his speculative houses were being used as models to build custom houses. Thus, the speculative house would stand on the market while the customer saved the sales commission by going across the street to build a custom house.

The trial court concluded that Black, Mark and Stack and the other builders engaged in agreements and understandings which were contracts, combinations and conspiracies to fix prices of lots and new homes in Comstock, a per se violation of RCW 19.86.030, as well as an unfair method of competition in violation of RCW 19.86.020. The trial court based its conclusion on its findings that (1) Black, Stack and Mark established the minimum price at which the lots were offered to potential consumer buyers, (2) Black, Stack and Mark communicated with the other builders the minimum price of the lots for resale to consumers as well as informing them that their price was discounted 15 percent, (3) Black, Stack and Mark and the other builders understood and agreed that this minimum price was the guideline for builder–consumer sales and (4) Black, Stack and Mark agreed that all purchasers of custom houses would pay a 6 percent commission to Black, Inc., and they enforced this agreement with the other builders. In my judgment, the trial court's conclusions were correct.

Traditionally, the practices which the federal courts have deemed to be per se unlawful are price fixing, division of markets, group boycott, and tying arrangements. *Arizona v. Maricopa Cy. Med. Soc'y,* 457 U.S. 332, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982). When conduct is found to fall within one of these categories, any explanation of why the act was done or what its effect might be in a particular case is of no consequence or materiality. *Plymouth Dealers' Ass'n v. United States,* 279 F.2d 128, 131 (9th Cir. 1960).

Categorically, restraints of trade are either horizontal, an agreement between competitors at the same level of the market structure, or vertical, agreements between competitors at different levels of the market structure, *e.g.,* manufacturers and distributors, *United States v. Topco Assocs.,* 405 U.S. 596, 31 L. Ed. 2d 515, 92 S. Ct. 1126, 1136 (1972). In price fixing cases, both horizontal and vertical agreements are per se antitrust violations. *White Motor Co. v. United States,* 372 U.S. 253, 9 L. Ed. 2d 738, 83 S. Ct. 696 (1963); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 4

L. Ed. 2d 505, 80 S. Ct. 503 (1960); *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 95 L. Ed. 219, 71 S. Ct. 259 (1951).

The agreement between Black, Stack and Mark and the other builders, that the price they fixed for the lot would be the price at which all of the builders (horizontal competitors) would offer the lots for sale, shifted the defendants' activity from the arena of legitimate corporate decision-making into the realm of antitrust violations. In other words, Black, Stack and Mark set the prices at which Stack and Mark, as well as their horizontal competitors, the other builders, would charge a consumer for a lot in Comstock. It must be remembered that while setting these prices Stack and Mark retained their competitor identity and were competing with one another in Comstock.

There are no antitrust problems with the defendants forming CDC to market Comstock lots and setting the price at which CDC would sell its product. In fact, that is what was done when the defendants agreed that CDC would charge $9,350 to the builder who was allocated the Ballos' lot. The antitrust problems arose when the defendants *and* the other builders mutually agreed that the $11,000 price would be the agreed minimum price for builder–consumer sales. Thus, I would hold the agreement between Black, Mark and Stack and the other builders to set the price at which a builder would sell a lot purchased from CDC was an agreement between competitors and a per se violation of RCW 19.86.030.

The second agreement which directly affected the Ballos was the agreement between Black, Stack and Mark and the other builders to charge all custom home purchasers a 6 percent commission on the combined value of the lot and house. The admitted purpose of this agreement was to "equalize the prices of custom and speculative homes so custom home buyers did not enjoy any advantage over the speculative home buyer." This agreement clearly falls within the classical definition of price fixing:

[A] combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*

*United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 84 L. Ed. 1129, 60 S. Ct. 811 (1940). I would hold the agreement between Black, Stack and Mark and the other builders to equalize prices, by imposing a 6 percent commission on custom home buyers, is an agreement between horizontal competitors in restraint of trade and a per se violation of RCW 19.86.030.

I also agree with the trial court's conclusion that the agreements which constituted price fixing in per se violation of RCW 19.86.030 also constituted unfair methods of competition in violation of RCW 19.86.020.

Our State's unfair competition statute is RCW 19.86.020: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." In order to establish a per se consumer protection violation based on RCW 19.86.020 the conduct must meet a twofold test: (1) is the action illegal, *i.e.,* is it unlawful; and (2) is it against public policy as declared by the Legislature or the judiciary. *Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 358, 581 P.2d 1349 (1978).

I have already opined that the defendants' actions constituted price fixing in per se violation of RCW 19.86.030 and were the proximate cause of the Ballos' damages. RCW 19.86.920 provides in part: "the purpose of this act is . . . to protect the public and foster fair and honest competition." Thus, the Ballos have established the elements necessary for a per se violation of the unfair methods of competition clause of the CPA.

The majority takes the position that CDC was a corporate joint venture and the actions condemned by the trial court were merely actions necessary to market the joint venture's product. I recognize that persons who would otherwise be competitors may legitimately pool their capi-

tal and share profits and losses. *Maricopa,* 457 U.S. at 355–
57; *see Broadcast Music, Inc. v. Columbia Broadcasting
Sys., Inc.,* 441 U.S. 1, 60 L. Ed. 2d 1, 99 S. Ct. 1551 (1979).
However, the fundamental flaw in the majority's position is
that Black, Stack and Mark were not the only actors in the
conspiracy. The antitrust problem arose when the joint
venturers banded together with the other builders who
were not corporate officers and agreed to set resale prices
on lots and charge a 6 percent commission on the sale of
custom homes. Once the defendants acquired the land from
CDC and sought to resell it to the public while maintaining
their separate and distinct economic identities as competi-
tors, they were no longer acting solely as joint venturers.
When the other builders were made a part of this scheme,
the trial court properly found there was an agreement
among horizontal competitors which constituted illegal
price fixing.

The remaining issues raised by Black concern the Supe-
rior Court's (1) issuance of a permanent injunction which
prohibited Black from participating in horizontal price fix-
ing, (2) award of treble damages and (3) attorney fees, and
(4) denial of Black's motion for an independent appraisal of
the Ballo home and lot. Because I am in a dissenting posi-
tion, I will not treat these issues at length. Suffice it to say
that the facts and the pertinent law support a holding that
the trial court did not abuse its discretion with regard to
these items.

Finally, I turn to the Ballos' cross appeal which assigns
error to rulings made by the Superior Court on the ques-
tions of certification and decertification of their class
action.[4] Again, these questions are ones left to the discre-

---

[4]After the trial court had sent notice of certification of a class action to the
other purchasers of custom homes built by Stack or Mark in the subdivision,
Black, Stack and Mark personally contacted most of the class members. This
improper action by Black, Stack and Mark necessitated that the trial court
appoint two special masters to investigate. They determined that the potential
class members had been supplied with sufficient information to make a voluntary
and intelligent decision, and that they had decided to opt out of the class.

tion of the trial court, and I find no abuse of discretion on the record.

In summary, I would affirm the judgment of the Superior Court that Black, Stack and Mark engaged in illegal price fixing in violation of RCW 19.86.030 and thereby engaged in unfair methods of competition in per se violation of RCW 19.86.020. I would also affirm the Superior Court's award of treble damages, costs and attorney fees, and its rulings regarding certification and decertification of the class. Pursuant to the Consumer Protection Act, RCW 19.86.090, I would award the Ballos their reasonable attorney fees for this appeal.