IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE EVERETT CLINIC, PLLC, a Washington limited liability company<br><br>Appellant,<br><br>v.<br><br>PREMERA, a Washington corporation, and PREMERAFIRST, INC., a Washington corporation<br><br>Respondent. | No. 82687-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Premera, a health care insurer, had separate contractual agreements with the Everett Clinic (TEC) and Eastside Family Medical Clinic (EFMC) for health care services provided to Premera enrollees. In 2018, TEC purchased certain assets of EFMC and began charging Premera the reimbursement rate under the TEC-Premera contract for the services at that location. Premera continued to reimburse at the lower rate set out in the EFMC-Premera contract. TEC sued for breach of contract and declaratory judgment. Premera counterclaimed for breach of contract, tortious interference, and violation of the Consumer Protection Act (CPA), ch. 19.86 RCW. The trial court granted Premera's motion for summary judgment on TEC's claims for breach of contract and declaratory relief and on Premera's CPA claim. The trial court also awarded Premera attorney fees and costs.

We conclude that the TEC-Premera contract allows TEC to charge the higher reimbursement rate at the newly acquired location and that TEC is not bound by the EFMC-Premera Agreement under principles of successor liability. Additionally, Premera has failed to establish that TEC engaged in unlawful tying in violation of the CPA. Therefore, we reverse the grant of summary judgment for Premera on both the contract and CPA claims, reverse the awards to Premera of attorney fees and costs, and remand for entry of summary judgment for TEC on its breach of contract and declaratory judgment claims.

FACTS

Premera is a not-for-profit company that provides health insurance plans to more than two million people in Washington State. Premera has contracts for standard reimbursement rates with many health care providers. Some health care providers can command much higher reimbursement rates due to their market power. Premera negotiates directly with these providers to establish their rates. The Everett Clinic (TEC) is one such provider.

TEC is a large physician group operating multiple clinics that provide health care services in Washington. As of May 2019, TEC had 550 clinicians serving 320,000 patients in 30 locations. TEC is the dominant health care provider in Snohomish County. In 2009, TEC and Premera entered into a contract for TEC (TEC Agreement) to provide services to Premera enrollees at an agreed rate. Premera pays TEC among the highest rates in Washington due to TEC's market power in Snohomish County.

TEC was well-known and respected in Snohomish County but had little presence in King County. TEC wanted to grow and acquire medical groups in King County in order to increase its brand presence. To that end, TEC became interested in purchasing Eastside Family Medical Clinic (EFMC), a small Bellevue medical practice owned by three physicians. On December 1, 2018, TEC finalized an asset purchase agreement of certain assets of EFMC, and the clinic became part of TEC.

Prior to the purchase by TEC, EFMC had its own contract with Premera (EFMC Agreement) that had a much lower reimbursement rate. The TEC purchase agreement did not list the EFMC Agreement as a purchased asset or assigned contract. Because it was not an assigned contract, TEC considered the EFMC Agreement to be an excluded asset for the purpose of its purchase agreement. In November 2018, before the asset purchase agreement closed, TEC requested that Premera begin to pay TEC's rates from the TEC Agreement (TEC rate) at the Bellevue clinic[1] as of January 1, 2019. Premera refused and offered instead to pay a "blended rate," which TEC did not accept.

When it assumed operations at EFMC, TEC began charging the TEC rate at the Bellevue clinic. Premera instead continued to reimburse for services provided at the Bellevue clinic at the rate established by the EFMC Agreement. The TEC Agreement expired at the end of 2020. In October 2020, Premera sent a proposal for 2021 rates, to which TEC did not respond.

---

[1] We will refer to the former EFMC after TEC's asset purchase as "the Bellevue clinic."

3

In September 2019, TEC filed a complaint for breach of contract against Premera, requesting damages and a declaration of rights under the TEC Agreement. Premera answered with counterclaims for breach of the TEC Agreement by TEC, breach of the EFMC Agreement by EFMC, tortious interference with the EFMC Agreement by TEC and the prior physician owners of EFMC, and a violation of the Consumer Protection Act (CPA) through an unlawful tying arrangement. Premera also asserted as an affirmative defense that TEC is bound by the EFMC Agreement under the doctrine of successor liability. EFMC moved to dismiss Premera's counterclaims for tortious interference and breach of contract. The trial court granted EFMC's motion and dismissed EFMC and its prior physician owners from the case.

In April 2020, Premera filed its own lawsuit against TEC and EFMC requesting a declaratory judgment that the EFMC Agreement continues in full effect and that TEC has breached the TEC and EFMC Agreements. The trial court consolidated the two lawsuits, but they retained their separate identities.

TEC filed a motion to dismiss Premera's claims in the second suit. The trial court granted the motion and awarded attorney fees and costs after finding that Premera initiated the lawsuit in bad faith. Premera appealed, and this court reversed the dismissal and the award of attorney fees.[2] That case is now stayed pending resolution of this appeal.

---

[2] Everett Clinic, PLLC v. Premera, No. 81684-5-I, slip op. at 10 (Wash. Ct. App. August 16, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/816845.pdf.

In this case, in January 2021, TEC filed a motion for partial summary judgment on Premera's counterclaims, which the court denied. In March 2021, Premera moved for summary judgment on its CPA claim and TEC's claims for breach of contract and declaratory relief. Also in March 2021, TEC filed a second summary judgment motion on its claims for breach of contract and declaratory relief. The trial court granted Premera's summary judgment motion and denied TEC's second summary judgment motion. The trial court also denied TEC's motion for reconsideration and entered an award and a supplemental award of attorney fees and costs for Premera.

TEC appeals.

## ANALYSIS

We review orders on summary judgment de novo. Kim v. Lakeside Adult Family Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)). We consider the evidence and reasonable inferences in the light most favorable to the nonmoving party. Kim, 185 Wn.2d at 547. To defeat summary judgment, the opposing party must set forth specific facts showing a genuine issue of material fact and may not rely on allegations or self-serving statements. Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc., 114 Wn. App. 151, 157, 52 P.3d 30 (2002).

I.     Contract Claims

Premera's relationships with both TEC and EFMC are governed by contract. Washington follows the objective manifestation theory of contracts where "we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than the unexpressed subjective intent of the parties." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Therefore, "[m]utual assent of the parties must be gleaned from their outward manifestations." Saluteen-Maschersky, 105 Wn. App. 846, 854, 22 P.3d 804 (2001). Subjective intent lacks relevance if intent can be determined from the actual words used. Hearst, 154 Wn.2d at 503-04. The court must examine the reasonable meaning of the words used, giving effect to their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. Id. at 504. "Courts will not revise a clear and unambiguous agreement or contract for parties or impose obligations that the parties did not assume for themselves." Condon v. Condon, 177 Wn.2d 150, 163, 298 P.3d 86 (2013).

A trial court may examine extrinsic evidence "for the limited purpose of construing the otherwise clear and unambiguous language of a contract in order to determine the intent of the parties." Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 84, 60 P.3d 1245 (2003). Thus, extrinsic evidence relating to the context of the agreement may be examined to determine the meaning of specific words and terms used, but cannot show "intention independent of the instrument" or "vary, contradict or modify the written word." Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999). "The court considers the relevant evidence of

the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made in those negotiations, trade usage, and the course of dealing between the parties." Diamond B Constructors, Inc. v. Granite Falls Sch. Dist., 117 Wn. App. 157, 161, 70 P.3d 966, 968 (2003).

Both the TEC and EFMC Agreements include the same provisions on assignment or transfer and on change in ownership or control. Section 9.02 of both agreements reads:

> A. Assignment or Transfer. Provider shall not assign or transfer, or attempt to assign or transfer, the rights, duties or obligations of this Agreement, in whole or in part, including but not limited to assignment or transfer by operation of law, to another Provider, Practitioner, person or entity, or apply or attempt to apply the terms of this Agreement, in whole or in part, to Covered Services provided to Enrollees by another Provider, Practitioner, person or entity, without Plan's prior written consent.
>
> B. Change in Ownership or Control. Any change in ownership or control of Provider, in whole or in part, directly or indirectly resulting by or from operation of law, merger, acquisition, affiliation, consolidation, stock transfer, asset sale, lease, corporate dissolution or otherwise, shall be deemed an assignment or transfer, or attempted assignment or transfer, of this Agreement that requires Plan's prior written consent. In the event of any such change or attempted change in ownership or control of Provider, or in the event Provider operates or does business under another name or with another Provider, Practitioner, person or entity, then this Agreement shall continue in full force and effect with respect to Covered Services provided by Provider to Enrollees.

The TEC Agreement establishes TEC as "Provider" and the EFMC Agreement establishes EFMC as "Provider" for the purposes of their respective individual contracts with Premera.

The parties' arguments boil down to different views as to which of the two agreements controls Premera's rates of payment to TEC for the services at the

7

Bellevue clinic. TEC argues that rates for services at all its locations are governed by the TEC Agreement, and that Section 9.02A, which prohibits applying the Agreement to "Covered Services provided to Enrollees by another Provider, Practitioner, person or entity," does not apply to the Bellevue clinic. On the other hand, Premera asserts that TEC's purchase of EFMC was a change in ownership or control, so under Section 9.02B and successor liability principles, the EFMC Agreement rate applies to services at the Bellevue clinic.

A.    The EFMC Agreement

Section 9.02B of the EFMC Agreement requires Premera's prior written consent before "[a]ny change in ownership or control of Provider." Further, in the event of any such change or attempted change, the Agreement "shall continue in full force and effect with respect to Covered Services provided by Provider to Enrollees."

TEC argues that "TEC's purchase of certain of EFMC's assets did not change the ownership or control of EFMC" because the EFMC Agreement was an asset excluded from the sale, and it was not identified in the asset purchase agreement as a "candidate for termination." Thus, TEC argues, the EFMC Agreement remained in effect[3]—not between Premera and EFMC, but between Premera and the new corporate entity, DAN MD, that was created solely to wrap up the accounts receivable and no longer provides patient care.[4] In TEC's view,

_____

[3] Neither party argues that the EFMC Agreement was terminated or that the termination provisions in Part 6 of the Agreement were triggered.

[4] As of December 1, 2018, EFMC no longer exists as a corporate entity. The successor corporate entity is DAN MD, P.S.

8

even though DAN MD does not provide services, it is still the "Provider" under the EFMC Agreement. Therefore, TEC cannot be bound by the requirements of 9.02B that apply to the Provider upon a change of ownership or control.

According to Premera, the EFMC Agreement continues to control the rate of payment by Premera for services provided at the Bellevue clinic, because this was a "change in ownership or control" covered by Section 9.02B. Notwithstanding the creation of DAN MD as a successor corporate entity for the remaining EFMC assets, Premera asserts TEC stepped into the shoes of EFMC and is "the Provider" covered by the EFMC Agreement through the doctrine of successor liability. Premera views TEC's purchase of EFMC as a de facto merger and the Bellevue clinic as a "mere continuation" of EFMC.[5]

"Washington adheres to the general rule that a corporation purchasing the assets of another corporation does not become liable for the debts and liabilities of the selling corporation." Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc., 166 Wn.2d 475, 481-82, 209 P.3d 863 (2009). An exception to this rule may exist, however, where (1) there is express or implied agreement for the purchaser to assume liability; (2) the purchase is a de facto merger; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability. Id. at 482. Successor liability is an equitable claim. Columbia State Bank v. Invicta Law Group PLLC, 199 Wn. App. 306, 316, 402 P.3d 330 (2017).

---

[5] Br. of Resp't at 43 (quoting Hall v. Armstrong Cork, Inc., 103 Wn.2d 258, 261-62, 692 P.2d 787 (1984)).

Thus, the determinative issue is whether the doctrine of successor liability applies to TEC such that it assumed liability for, and is "the Provider" in, the EFMC Agreement. Premera does not argue that there is an express or implied agreement for TEC to assume liability, or that the asset transfer was for the fraudulent purpose of escaping liability, but rather, focuses on the second two exceptions to the general rule of no successor liability. TEC argues that the asset purchase was not a de facto merger, nor is the Bellevue clinic a "mere continuation" of EFMC. We agree with TEC.

### 1. De Facto Merger

Premera contends the evidence creates a material issue of fact as to whether TEC's purchase of EFMC assets was a de facto merger. We disagree.

A merger or consolidation occurs with the union of two or more corporations that results in either the absorption of one by the other or a new corporate entity. Payne v. Saberhagen Holdings, Inc., 147 Wn. App. 17, 25-26, 190 P.3d 102 (2008). The resulting entity is responsible for the liabilities of the merged or subsumed company. Id. at 26. "De facto merger is a judicial framework for analyzing the substance of the transaction over its form." Id. Courts consider four factors for this analysis: (1) continuity of the business; (2) continuity of ownership; (3) the seller's existence ceasing as soon as legally and practically possible; and (4) the purchaser expressly or impliedly assumes the seller's obligations. Id.

"Generally, a de facto merger is found where a seller corporation continues its business existence as an absorbed part of the buyer and the

10

seller's shareholders or officers continue their interest in the business after the dissolution of the selling corporate entity." Fox v. Sunmaster Prods, Inc., 63 Wn. App. 561, 570, 821 P.2d 502 (1991). The typical example is "when the consideration given to the selling corporation for its assets is shares of the purchasing corporation's stock, rather than cash." Cashar v. Redford, 28 Wn. App. 394, 398, 624 P.2d 194 (1981); Payne, 147 Wn. App. at 26. The rationale is that shareholders of the seller corporation retain an ownership interest in the business transferred. Uni-Com Nw., Ltd. v. Argus Publ'g Co., 47 Wn. App. 787, 802, 737 P.2d 304 (1987). Washington courts have generally declined to assign successor liability under the de facto merger theory without a stock transaction. See Cashar, 28 Wn. App. at 398; Uni-Com Nw. Ltd., 47 Wn. App. at 803-04; Payne, 147 Wn. App. at 26.

Premera contends that the lack of a stock transaction for purchase of EFMC is not fatal, relying on Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mortgage Services, 989 F. Supp. 2d 411, 430-31 (E.D. Pa. 2013), aff'd, 785 F.3d 96 (3d Cir. 2015). While Lehman Bros., a federal case interpreting another state's law,[6] is not controlling here, we agree that a stock transaction is not required for a de facto merger. "Not all four elements must be present to find

---

[6] In Lehman Bros., a federal court considered similar Pennsylvania law on de facto mergers. 989 F. Supp. 2d at 430-31. The court concluded that an exchange of stock was not necessary to prove continuity of ownership for a de facto merger, relying on a Pennsylvania Supreme Court decision that so held, and which noted the incongruity of a blanket rule that a de facto merger required purchase with stock shares when the state statute governing corporate mergers did not require the same. Id. at 434 (analyzing Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc., 615 Pa. 242, 42 A.3d 951, 968-69 (2012)).

an asset purchase constitutes a de facto merger." Payne, 147 Wn. App. at 26.

However, "continuity of ownership has repeatedly been held essential." Id.

Here, using the judicial framework for de facto mergers, we determine there is no triable question of fact as to whether TEC's purchase of EFMC was a de facto merger for the purpose of successor liability, particularly because evidence of the essential element of continuity of ownership is lacking.[7] The record does show some continuity of business, as after acquisition by TEC, the Bellevue clinic outwardly continued to function as before. The Bellevue clinic as part of TEC maintained the same location, retained most of its employees, and offered the same services. TEC made some changes to procedure and installed computers in every exam room. But the goal of the acquisition, as stated by TEC's business development project manager for the EFMC asset purchase, was that "an office visit should feel the same on day one as it did the day before day one." EFMC informed its patients that the only immediate change would be that billing statements would come from TEC. The Bellevue clinic initially

---

[7] In support of a de facto merger, Premera submitted a declaration from expert Lawton R. Burns of the Wharton School of the University of Pennsylvania. He opined that the TEC/EFMC combination was a merger rather than an asset purchase. According to Burns, the transaction was a de facto merger because EFMC was absorbed into TEC, EFMC's owners retained indicia of ownership and continuing control, the enterprise functioned uninterrupted, and EFMC remained only as a paper entity. Thus, on this topic, Burns's declaration provides an improper legal opinion. "Experts may not offer opinions of law in the guise of expert testimony." Terrell C. v. Dep't of Soc. & Health Servs., 120 Wn. App. 20, 30, 84 P.3d 899 (2004). This court makes its own determinations on legal issues. Zwink v. Burlington Northern, Inc., 13 Wn. App. 560, 567, 536 P.2d 13 (1975) ("[I]t is the province of the court to determine questions of law.").

continued to identify itself as Eastside Family Medicine so patients would not be confused.[8]

On the other hand, while many aspects of the Bellevue clinic's patient-facing services remained unchanged, it is undisputed that TEC's business operations process was superimposed on the normal daily patient operations. All work involving billing, deposits, and interactions with insurance companies was relocated to Everett. The reporting structure also changed. Whereas the three original owners shared their management duties equally and governed together, after the asset purchase, only Antony Egnal assumed a management role at the Bellevue clinic. As the facility medical director, he held a general leadership role and oversaw staffing and management issues at the clinic.

Regarding the "essential" factor for a de facto merger, continuity of ownership, it is undisputed that the ownership changed. The asset purchase agreement identified the sellers as Eastside Family Medicine Clinic, a professional services corporation, and its three physician shareholders, and the buyers as The Everett Clinic, PLLC and Everett MSO, Inc. (MSO), which provides non-clinical management services to TEC. The purchase agreement provided that MSO would purchase identified assets relating to administrative and/or non-clinical portions of the practice, and TEC would purchase identified assets relating to the clinical portions of the practice.

---

[8] Initially, after the acquisition, receptionists answered the phone as The Everett Clinic at Eastside Family Medicine. Due to negative feedback, they switched for about a year to "Eastside Family Medicine of The Everett Clinic," and subsequently, "The Everett Clinic Eastside Family Medicine."

The three physician shareholders of EFMC became employees of TEC. Although TEC formally designated them as "partner physicians," that title did not confer any ownership interest in TEC. They each signed a "physician partner employment agreement" that provided rights and privileges such as eligibility to vote and run for election to clinic leadership, the right to appeal terminations, and removal of geographic restrictions on competition. "Partnership" provided employment benefits and opportunity for managerial participation rather than any ownership interest. The former EFMC physicians understood that they were not owners or shareholders at TEC. Ownership and operational control moved to TEC and MSO.

Finally, as to the last two factors for determining whether there has been a de facto merger, while the seller EFMC ceased to exist in December 2018, the asset purchase agreement clearly identified which of the EFMC's obligations the purchasers were assuming and which they were not. The purchase agreement included specific sections addressing purchased assets, excluded assets, assumed liabilities, and excluded liabilities. The record establishes that the purchaser did not expressly or impliedly assume all of the seller's obligations.

In light of the undisputed evidence, including evidence of a clear change in ownership, Premera failed to present evidence necessary to establish that TEC's purchase of the EFMC practice was a de facto merger.

2. Mere Continuation

Premera alternatively contends TEC's operations at EFMC's former facility make it a "mere continuation" of EFMC, leading to successor liability. Again, we disagree.

In assessing whether a successor business is a "mere continuation" of a prior entity, courts rely on factors such as "common identity between the officers, directors, and stockholders of the selling and purchasing companies, and the sufficiency of the consideration running to the seller corporation in light of the assets being sold." Cambridge Townhomes, 166 Wn.2d at 482. The fact that the purchaser continues the operations of the seller does not necessarily impose liability. Cashar, 28 Wn. App. at 397. The objective is to determine whether the purchaser is "merely a 'new hat' for the seller." Id. (internal citations omitted). The particular form of the business entity is not determinative. Cambridge Townhomes, 166 Wn.2d at 482.

Where the facts are undisputed, the court may rule whether a successor entity is a mere continuation of a predecessor entity as a matter of law. See, e.g., Northgate Ventures LLC v. Geoffrey H. Garrett PLLC, 10 Wn. App. 2d 850, 450 P.3d 1210 (2019) (affirming summary judgment dismissal of claims against a law firm; undisputed facts showed that though the same attorney was the sole member of both the predecessor and new law firm, the new law firm had paid adequate consideration for the assets, so plaintiff's mere continuation claim failed); Cambridge Townhomes, 166 Wn.2d 475 (Supreme Court affirmed reversal of the trial court's ruling dismissing claims against a successor

corporation, holding corporation was a "mere continuation" of prior sole proprietorship where it was undisputed that the same individual was the head of both the initial and subsequent entities and there was no issue regarding sufficient consideration because there was no sale of assets).

Here, there is no dispute that consideration was paid and that it was sufficient "in light of the assets being sold." Cambridge Townhomes, 166 Wn.2d at 482. [9] And as discussed above, it is also undisputed that the ownership of the former EFMC changed and there was no "common identity between the officers, directors, and stockholders of the selling and purchasing companies." Cambridge Townhomes, 166 Wn.2d at 482. The three original shareholders of EFMC sold most of EFMC's assets to TEC and MSO, who became the new owners of the Bellevue clinic location.

Premera has not established successor liability such that TEC is bound by the EFMC Agreement. The requirements and limitations in the event of a change in ownership or control outlined in section 9.02B do not apply to TEC's purchase of EFMC. Because TEC is not the "Provider" in the EFMC Agreement, it is not obligated by that Agreement to charge the EFMC rates for services at the new TEC location at the Bellevue clinic.

B.    The TEC Agreement

---

[9] Premera makes only a passing statement about the consideration paid for purchase of EFMC, noting that "[t]he value of the employment agreements, and the lucrative retention bonuses they received, explain why the cash that TEC paid was substantially less than the appraisal TEC obtained." Br. of Resp't at 49.

Premera also maintains that TEC breached Section 9.02A of the TEC Agreement under which it was obligated to obtain written consent prior to "an attempt to apply the terms of this Agreement, in whole or in part, to Covered Services provided to Enrollees by another Provider, Practitioner, person or entity." Thus, whether 9.02A of the TEC Agreement applies depends on whether the Bellevue clinic is "another Provider, Practitioner, person or entity." We conclude it is not.

Premera asserts that section 9.02A governs acquisition of another practice and prohibits TEC from applying the TEC Agreement and its higher rates to the Bellevue clinic.[10] TEC contends the asset purchase "did not result in EFMC operating under another name or in conjunction with another business," because "TEC alone owns and operates its Bellevue clinic location." Under this interpretation, TEC is not "another Provider" but rather, "the Provider" at the Bellevue location.

The plain language of the Agreement read as a whole supports TEC's interpretation. The first line of the TEC Agreement identifies TEC as a party to the contract and notes TEC will be "hereafter referred to as 'Provider.'"[11]

In the "General Provisions" section, Section 9.01 defines the "relationship of the parties," stating "This Agreement shall be construed to confer no rights

---

[10] Section 9.02B is not applicable because there was no "change in ownership or control" of TEC, the Provider in the TEC Agreement.

[11] Section 1.14 in the "Definitions" section of the TEC Agreement defines "Provider" as defined as "any individual or entity which agrees to accept from and to look solely to Plan for payment according to the terms of the Subscriber Agreement for Covered Services rendered to Enrollees according to the terms of this Agreement."

whatsoever on any third parties, including Enrollees, other providers, or other individuals or entities." Next, also in the "General Provisions" section, Section 9.02A prohibits the assignment of TEC's contract provisions to "another Provider, Practitioner, person or entity."

The dictionary defines "another" as "different or distinct from the one first named or considered." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 89 (2002). Because TEC is named as Provider, the plain language of Section 9.02A prevents assignment of the contract provision to those who are "different or distinct from" TEC.

Prior to the asset purchase, EFMC was not a TEC entity, and would have been considered "different or distinct from TEC," and therefore, "another Provider" under the TEC Agreement. However, when TEC acquired EFMC's assets, EFMC ceased to exist as a health care services provider. The Bellevue clinic became another TEC location, part of the larger TEC entity that is "the Provider" for the purposes of the TEC Agreement. Through operation of the asset purchase, the Bellevue clinic is not "another Provider, Practitioner, person or entity" subject to the requirement of Premera's written consent as set out in Section 9.02A of the TEC Agreement. Therefore, Section 9.02A does not preclude the assignment or transfer of TEC rates to the Bellevue clinic as a location of the Provider.

Premera argues that it drafted Section 9.02A to prevent TEC from transferring the higher rates of reimbursement, necessitated by Snohomish County market forces, to smaller clinics outside that county. While that may have

18

been Premera's intent, the language of Section 9.02A does not account for the fact that the asset purchase and employment agreements with former EFMC physicians resulted in the assets and employees becoming a part of TEC and no longer "another Provider, Practitioner, person or entity." As Premera was the drafter, any ambiguities in the contract are construed against it. See King v. Rice, 146 Wn. App. 662, 671, 191 P.3d 946 (2008).

Moreover, the TEC Agreement contemplates TEC adding new practitioners. TEC warrants that any affiliated practitioners meet the Plan's credentialing standards and requires TEC to provide notice and certain information to the Plan, including "ownership, business address, tax identification number of new persons or entities proposed to be included as a Provider pursuant to this Agreement …." Further, the Agreement addresses the situation of TEC contracting with others to provide covered services and requires the contracting entities to comply with the Agreement, including with provisions on payment and billing.[12] These terms in the TEC Agreement indicate that through those contracts with additional practitioners, those practitioners' services become services provided by the Provider rather than by "another Provider."

---

[12] Section 3.11 states: "Employed or Contracted Providers. If Provider is signing on behalf of a legal entity, each individual physician who is employed by or contracted with such entity must comply with the terms of this Agreement." CP 2330. Section 4.01F on "Payment and Billing" states, "If Provider contracts with other providers that agree to provide Covered Services to Plan Enrollees with the expectation of receiving payment directly or indirectly from Plan, such Providers and health care facilities must agree to abide by the provisions of A, B, C, D and E of this section [which address limitations on seeking payment and billing of Enrollees]."

Extrinsic evidence of the parties' course of dealing also supports TEC's understanding that it is the "Provider" and entitled to reimbursement at its negotiated rate at all of its locations—even those established by acquisition.[13] TEC has clinics throughout Snohomish County and an increasing number of clinics in other counties. Historically, the TEC Agreement rate applied to all new TEC locations. For example, TEC opened new locations in Edmonds, Woodinville, and Bothell in 2017 and 2018. Premera reimbursed service at all of these locations under the TEC rate. Also during this period, TEC purchased assets of Totem Lake Family Medicine that became TEC's Kirkland location. After the acquisition, Premera paid the TEC rate at the Kirkland location. In fact, prior to the Bellevue clinic, Premera had never refused to pay the TEC Agreement's reimbursement rate at a new TEC location, whether newly established or obtained through acquisition of a pre-existing practice.[14] Thus, TEC's application of the TEC Agreement and rates to the Bellevue location is not an improper transfer in violation of Section 9.02A of the TEC Agreement to a third party in breach of its contract with Premera. Rather, TEC seeks merely to enforce the terms of the Agreement to the Bellevue location as a part of TEC itself, the Provider.

---

[13] Course of dealing " 'is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.' " Puget Sound Financial, LLC v. Unisearch, Inc., 146 Wn.2d 428, 436, 47 P.3d 940 (2002) (quoting RESTATEMENT (SECOND) OF CONTRACTS SEC. 223 (1981)).

[16] In 2020, Premera declined to pay the TEC rate after a similar acquisition of Island Internal Medicine.

The trial court erred in granting summary judgment for Premera on its breach of contract claim. Instead, Premera is in breach by failing to pay the reimbursement rate established by the TEC Agreement. TEC is entitled to summary judgment on its breach of contract claim and declaratory judgment that Premera is required to reimburse services at the Bellevue clinic at the TEC rates.

## II.  Consumer Protection Act Claim

Premera argues that TEC violated the CPA by engaging in unlawful tying. TEC argues that Premera has not proved unlawful tying or other requirements for a CPA claim. We agree with TEC that the record does not establish a question of fact regarding unlawful tying, so it is entitled to summary judgment dismissal of the CPA claim.

The CPA prohibits unfair methods of competition in the conduct of trade or commerce. RCW 19.86.020. The CPA expressly applies to anti-competitive activities. "Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." RCW 19.86.030. This provision of the CPA is equivalent to section 1 of the federal Sherman Antitrust Act, 15 U.S.C. § 1, and interpretation of the federal act guides our state courts. State v. Black, 100 Wn.2d 793, 799, 676 P.2d 963 (1984).

Federal courts have determined, and Washington courts agree, that some agreements and practices are so plainly anti-competitive that they constitute "per se" violations of the Sherman Act. Ballo v. James S. Black Co., Inc., 39 Wn. App. 21, 26, 692 P.2d 182 (1984). Unlawful tying arrangements are one such per se violation. Id. at 26.

21

"Tying is defined as an arrangement where a supplier agrees to sell a buyer a product (the tying product), but 'only on the condition that the buyer also purchases a different (or tied) product. . . .' " Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1199 (9th Cir. 2012) (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). Tying arrangements are anti-competitive because a seller that has market power over the tying product can leverage that market to exclude other sellers of the tied product. Cascade Health Sols v. PeaceHealth, 515 F.3d 883, 912 (9th Cir. 2008). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006). The presence of "forcing" is a key indicator of restraint on competition in the market for the tied item. Jefferson Parish, 466 U.S. at 12.

A tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff can prove (1) the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a "not insubstantial volume of

22

commerce" in the tied product market. Cascade Health Sols., 515 F.3d at 913. TEC contends that Premera fails to establish these elements.

Premera argues that the TEC physician services in Snohomish County and physician services at EFMC in Bellevue are two different products – specifically, that EFMC services are the tied product that Premera must purchase in order to secure the tying product of TEC services in Snohomish. According to Premera, "TEC provides services in Snohomish County and at the EFMC location to different patients in distinct facilities in different counties that, until an overnight switch, were sold by separate entities."

In support of its claim that there are two different products, Premera cites Jefferson Parish, 466 U.S. at 24, in which a hospital required its surgical patients to obtain anesthesiology services from specific providers. There, the hospital "combined the purchase of two distinguishable services in a single transaction." Id. The Court noted, "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." Id. at 19. A tying arrangement cannot exist unless two separate product markets are linked. Id. at 20-21.

In this case, Premera is purchasing one product, TEC provider services, in multiple locations. These services' main distinguishing characteristic is the location[15] where they are offered, unlike in Jefferson Parish, where anesthesia services were found to be a product separate from other hospital services. Id. at

---

[15] Various locations may also have different physicians and specialties.

23

24-25. <u>See also</u> <u>Times-Picayune Pub. Co. v. U.S.</u>, 345 U.S. 594, 613, 73 S. Ct. 872, 97 L. Ed. 1277 (1953) (the readership "bought" by advertisers in the morning newspaper was the selfsame "product" sold by the evening paper and not distinguishable in the eyes of buyers). Here, the purported tied products are not different products, but the same product in different geographic markets. Therefore, Premera has not established the first requirement for per se unlawful tying.

Additionally, Premera's purchase of services does not have the same force or coercion present in unlawful tying cases. Unlawful tying is anticompetitive because it forces the purchase of goods or services not otherwise desired. <u>Jefferson Parish</u>, 466 U.S. at 26; <u>Cascade Health</u>, 515 F.3d at 915. But TEC's acquisition of EFMC does not force Premera to buy a service it does not want. Premera historically purchased physician services from EFMC and provides no evidence of an interest in discontinuing those services after TEC's purchase of the practice. Rather, Premera wants the product—the services in Bellevue—but at a different rate from the price at the other TEC locations. While a situation in which a party uses its market power to drive up

24

prices can be anticompetitive,[16] here, Premera has not shown per se unlawful tying to satisfy the unfair practice component of a CPA claim.[17]

Because Premera failed to establish unfair practice as required for a CPA claim, TEC was entitled to summary judgment and dismissal of the CPA claim.

CONCLUSION

We reverse the trial court's summary judgment in favor of Premera on its CPA claim and on TEC's claims for breach of contract and declaratory relief. Because we reverse the court's order granting summary judgment on the CPA claim, we also reverse the awards to Premera of attorney fees and costs that are predicated on the CPA claim. Finally, we remand for entry of summary judgment

---

[16] Premera mischaracterizes the holding in Washington v. Franciscan Health System, 388 F. Supp. 3d 1296 (W.D. Wash. 2019). This was not a tying case, but rather, a challenge to Franciscan Health System's acquisition of a multi-specialty group. The claim there was that agreements by Franciscan and a multispecialty physician group to jointly negotiate prices constituted a horizontal price-fixing agreement that was per se illegal or otherwise constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that the effect of the acquisition was to substantially lessen competition to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Id. at 1299.

[17] Premera also raises another ground for its CPA claim, that TEC violated antitrust laws by acquiring information from EFMC that detailed financial information about EFMC's relationship with Premera before closing the asset purchase. TEC refers to this as Premera's horizontal price fixing argument. However, Premera did not make this argument below. In support of this ground, Premera cites only to an article published by the Federal Trade Commission that " 'collection of company-specific information about future product offerings, price floors, discounting practices, expansion plans, and operations and performance' before closing of the acquisition is an antitrust violation under the Sherman Act." Br. of Resp't at 68-69 (quoting Holly Vedova et al., *Avoiding antitrust pitfalls during premerger negotiations and due diligence*, Fed. Trade Comm'n (Mar. 20, 2018), https://www.ftc.gov/newsevents/blogs/competition-matters/2018/03/avoiding-antitrustpitfalls-during-pre-merger). Premera fails to provide citations to legal authority and argument as to this alleged antitrust violation. We do not consider conclusory arguments that are unsupported by citation to authority. Brownfield v. City of Yakima, 178 Wn. App. 850, 876, 316 P.3d 520 (2014); RAP 10.3(a)(6). Nor must we consider an argument raised for the first time on appeal. RAP 2.5(a).

for TEC on its claim for breach of the TEC Agreement and for declaratory

judgment and for further proceedings consistent with this opinion.

Reversed.

_Chung, J._

WE CONCUR:

_Bremmer, J_          _Andrus, C.J._